674 F.2d 1327
 UNITED STATES of America, Plaintiff-Appellee,
v.
John Christopher BEALE, Defendant-Appellant.
 No. 80-1652.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 9, 1981.
Decided April 22, 1982.
 
 Dan Alfaro, Corpus Christi, Tex., Paul H. Duvall, San Diego, Cal., for defendant-appellant.
 Bruce P. Castetter, Asst. U. S. Atty., San Diego, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of California.
 Before ELY, FLETCHER, and REINHARDT, Circuit Judges.
 ELY, Circuit Judge:
 
 
 1
 This case, an appeal from a conviction of possession with intent to distribute and conspiracy to possess with intent to distribute a controlled substance, raises important constitutional issues relating to the application of Fourth Amendment rubric to the Government's use of trained canines to detect illegal substances not subject to perception by the unaided human senses. Because we hold that the use of trained canines in this case was improper absent a showing of "founded suspicion," we vacate and remand.
 
 FACTS
 
 2
 As appellant Beale was convicted in a bench trial on stipulated facts, we consider the facts, as stipulated and as adduced at the suppression hearing, to be undisputed. The following rendition is gleaned from the trial "record," in the light most favorable to the Government. See United States v. Nelson, 419 F.2d 1237, 1241 (9th Cir. 1969).
 
 
 3
 On April 17, 1980, Detective Rick Berks of the Broward County Sheriff's Department was assigned to the airport detail at the Fort Lauderdale (Florida) Airport. This detail, which Detective Berks had performed for at least two years, is responsible for the "interdiction" or interception of narcotics contraband passing through the airport. Also on duty were Deputy Sheriff Larry Burk and a trained canine, "Nick."
 
 
 4
 Berks observed two male caucasians, subsequently identified as John Beale and Joseph Pulvano, exit a taxicab in front of the National Airlines terminal. Beale and Pulvano checked three pieces of luggage with a "skycap" and then entered the terminal together. Upon reaching a security checkpoint inside, they separated and obtained their seating assignments from the ticket counter independently. They both possessed first-class tickets to San Diego, with a change of planes in Houston. Berks ascertained that Beale's suitcase bore an identification tag indicating a New Jersey address. After separately departing from the ticket counter, Beale and Pulvano entered the National Airlines boarding area and sat down together.
 
 
 5
 Detective Berks, suspicious of the foregoing behavior,[1] approached Beale and Pulvano, identified himself, explained that they were not under arrest, and requested that they answer a few questions and produce some identification. Beale complied, producing his New Jersey driver's license. Pulvano, who appeared very nervous, stated that his identification was in his luggage, which he had just checked. Berks then asked the pair if they had ever been arrested. Pulvano said he had been arrested six years earlier on a narcotics charge. Berks thanked them for their cooperation and walked away. About five minutes later, Pulvano walked over to Berks and inquired if anything was wrong. Berks told Pulvano, who exhibited signs of abnormal anxiety-trembling hands, cracking voice, palpable agitation-that there was no problem at that time.
 
 
 6
 Berks proceeded to the baggage area, where he and Deputy Burk had "Nick" sniff or smell the vicinity of the suspects' bags. "Nick," an experienced and reliable drug detector, "alerted" on Beale's suitcase. As Beale and Pulvano had already boarded their flight to Houston, Berks contacted the Houston Police Department's airport detail and ran a computer check on the pair. Pulvano, the computer check revealed, had been arrested and convicted of possessing a large quantity of cocaine in an Atlanta airport approximately six months earlier.
 
 
 7
 Police officers in Houston kept the suspects and their luggage under surveillance as they changed planes in Houston. They deplaned separately and appeared as though they were not traveling together; they were the last two passengers to board the plane to San Diego. Agents in San Diego were alerted to the suspects' arrival.
 
 
 8
 When the plane arrived in San Diego, Beale and Pulvano, each carrying a shoulder bag, exited quickly and behaved warily. Beale did not go to the luggage area to claim his bags, but left the terminal and immediately attempted to board a taxicab. He was accosted by agents and, when asked about his luggage, asserted that he had lost the claim checks. While Pulvano was waiting inside the terminal at the baggage claim area, a United States Customs Service Officer and a trained canine "Duster" briefly intercepted the suspects' luggage. "Duster," an experienced and reliable narcotics detector, "alerted" on Beale's suitcase. When Pulvano retrieved the bags-including Beale's-and started to leave the airport, he too was accosted. "Duster" later "alerted" on Beale's shoulder bag.
 
 
 9
 Based on a sworn affidavit containing this information, the officers obtained a search warrant for Beale's suitcase and shoulder bag. Approximately 961 grams of cocaine were discovered in the shoulder bag and approximately 137 grams of marijuana were discovered in the suitcase.
 
 
 10
 Beale's motion to suppress the evidence obtained in these searches was denied. On the foregoing stipulated facts Beale was convicted of possession with intent to distribute and conspiracy to possess with intent to distribute a controlled substance-cocaine-in violation of 21 U.S.C. §§ 841(a)(1), 846.
 
 ISSUES ON APPEAL
 
 11
 The only issue not subject to stipulation is the constitutional propriety of the principal police encounters with Beale and Pulvano, i.e., their questioning in the Fort Lauderdale Airport, the "sniffing expedition" of their luggage in Fort Lauderdale, and their ultimate arrest and the search of their bags in San Diego.
 
 DISCUSSION
 I.
 
 12
 Beale contends that the officer's initial approach and non-custodial questioning of him and his companion constituted a "seizure" or detention under the Fourth Amendment, requiring founded suspicion or probable cause. The District Court, however, concluded otherwise[2] and we agree. The suspects' mobility was not impaired; the situation was non-coercive; Berks did not request that they follow him or otherwise alter their destination, schedule, or location; the questions were routine and brief, and in an atmosphere not dominated by law enforcement personnel; and the suspects agreed to answer Berks' queries "in a spirit of apparent cooperation."[3] See Sibron v. New York, 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968); United States v. Fry, 622 F.2d 1218, 1219-21 (5th Cir. 1980) (per curiam); United States v. Elmore, 595 F.2d 1036, 1041-42 (5th Cir. 1979), cert. denied, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980); 3 W. La Fave, Search and Seizure: A Treatise on the Fourth Amendment 48-55 (1978).
 
 
 13
 Thus, we need not consider whether "founded" or "articulable" suspicion existed at that time. Cf. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Corbin, 662 F.2d 1066, 1068-71 (4th Cir. 1981).
 
 II.
 
 14
 Beale next contends that even if the initial encounter was not an unlawful seizure, the use of the trained canine "Nick" to "conduct a sniffing expedition" of his luggage in the baggage area of the Fort Lauderdale Airport constituted an illegal search. If the "sniffing expedition" were an illegal search, the Government would face a difficult, perhaps impossible, burden of showing that this did not taint or infect the ultimate search of Beale's luggage in San Diego. See Wong Sun v. United States, 371 U.S. 471, 484-88, 83 S.Ct. 407, 415-17, 9 L.Ed.2d 441 (1963).
 
 
 15
 Unfortunately, the parties have treated the "dog sniffing" issue in absolute terms. Beale argues, for instance, that the primary issue is whether the use of "Nick" to sniff his suitcase was a search requiring probable cause. The District Court, in the suppression hearing, held that the use of trained canines in this case was not a search and, hence, that no showing of suspicion was required.[4] Similarly, the Government argues on appeal that "it is well-established that the use of trained dogs to sniff the exteriors of containers, including luggage, is not a search in violation of the Fourth Amendment." Brief of Appellee at 15.
 
 
 16
 Not only do these arguments oversimplify our holding in United States v. Solis, 536 F.2d 880, 882 (9th Cir. 1976), they also misapprehend the importance of a person's privacy interest in personal luggage. See Arkansas v. Sanders, 442 U.S. 753, 762, 764-65, 99 S.Ct. 2586, 2592, 2593, 61 L.Ed.2d 235 (1979); United States v. Chadwick, 433 U.S. 1, 11, 13, 97 S.Ct. 2476, 2483, 2484, 53 L.Ed.2d 538 (1977). See also United States v. Allen, 644 F.2d 749 (9th Cir. 1980); United States v. Homberg, 546 F.2d 1350, 1354-55 (9th Cir. 1976) (Ely, J., dissenting), cert. denied, 431 U.S. 940, 97 S.Ct. 2654, 53 L.Ed.2d 258 (1977); United States v. Moore, 483 F.2d 1361, 1363-64 (9th Cir. 1973).
 
 
 17
 Focusing on the precise physical nature of the canine sniffing obscures, we believe, the underlying Fourth Amendment interests. The Government emphasizes that only the "exterior of containers" were sniffed. Likewise, the Government relies on United States v. Bronstein, 521 F.2d 459, 461-63 (2nd Cir. 1975), cert. denied, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976), to counter Beale's argument that the use of trained canines is as intrusive under the Fourth Amendment as a magnetometer. Bronstein, however, like the earlier United States v. Fulero, 498 F.2d 748, 749 (D.C.Cir.1974) (per curiam), is a pre-Chadwick case.
 
 
 18
 We seriously doubt whether the reasoning employed in Bronstein and Fulero is still sound. In Bronstein the Second Circuit stated that "(t)here can be no reasonable expectation of privacy when one transports baggage by plane, particularly today when the menace to public safety by the skyjacker and the passage of dangerous or hazardous freight compels continuing scrutiny of passengers and their impedimenta." 521 F.2d at 462. By applying Chadwick to transcend and limit the "automobile exception" to the warrant requirement in Arkansas v. Sanders, 442 U.S. at 763-65, 99 S.Ct. at 2592-93, the Supreme Court seems to have rejected the Bronstein reasoning.[5] The D.C. Circuit's characterization as "frivolous" of the Fulero appellant's argument that a canine's sniffing of personal luggage was an unconstitutional intrusion into the lockers seems similarly flawed. 498 F.2d at 749.
 
 
 19
 Our analysis must begin with the premise that "the Fourth Amendment protects people, not places." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). "(M)ore particularly, it protects people from unreasonable government intrusions into their legitimate expectations of privacy." United States v. Chadwick, 433 U.S. at 7, 97 S.Ct. at 2481. The protection of the Fourth Amendment is invoked when the individual claiming it had a legitimate expectation of privacy in the invaded place. Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). The Supreme Court has recognized that "luggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." Arkansas v. Sanders, 442 U.S. at 762, 99 S.Ct. at 2592 (emphasis added). "(T)he critical factor relied on (in Arkansas v. Sanders ) was the objective nature of the suitcase as personal luggage, i.e., the inherent nature of the container itself rather than the behavior of its owner." United States v. Cleary, 656 F.2d 1302, 1304 (9th Cir. 1981), petition for cert. filed, 50 U.S.L.W. 3466 (U.S. Nov. 20, 1981) (No. 81-953).
 
 
 20
 Our inquiry, then, is whether the use of independent monitoring devices, such as drug-trained canines, to detect the presence of contraband within personal luggage[6] is an invasion of the owner's "inevitable" and "inherent" privacy interest in the contents therein.[7]
 
 
 21
 In United States v. Solis, 536 F.2d 880 (9th Cir. 1976), we avoided characterizing the use of trained canines in terms of conventional detection devices. Instead, we applied a general reasonableness standard. See id. at 881-83. Solis noted, without drawing an analogy, that:
 
 
 22
 Generally evidence acquired by unaided human senses from without a protected area is not considered an illegal invasion of privacy, but is usable under doctrines of plain view or open view or the equivalent. Odors so detected may furnish evidence of probable cause of "most persuasive character," Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948) ....
 
 
 23
 Id. at 881. Looking at the totality of the circumstances, we held in Solis that Customs Officers' use of trained "drug dogs" to sniff a semi-trailer parked on the lot of a gas station was reasonable and not a prohibited Fourth Amendment search for the following reasons: "The agents had a founded suspicion based on the partial corroboration of the informant's statements"; the semi-trailer was parked in an area open to the public; "(t)here was no invasion of the 'curtilage' "; and "(t)he investigation was not indiscriminate." Id. at 882.
 
 
 24
 Beale's privacy interest in the contents of his suitcase was far greater than Solis' expectation of privacy in his semi-trailer. See Arkansas v. Sanders, 442 U.S. at 761-66, 99 S.Ct. at 2591-94; United States v. Chadwick, 433 U.S. at 11, 13, 97 S.Ct. at 2483, 2484;[8] Cardwell v. Lewis, 417 U.S. 583, 589-92, 94 S.Ct. 2464, 2468-70, 41 L.Ed.2d 325 (1974); Carroll v. United States, 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). In fact, the Supreme Court has elevated personal luggage to the Fourth Amendment status accorded private residences:
 
 
 25
 No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions (by locking them in a piece of luggage) is due the protection of the Fourth Amendment Warrant Clause.
 
 
 26
 Chadwick, 433 U.S. at 11, 97 S.Ct. at 2483.
 
 
 27
 Whether arrested in a hotel lobby, an airport, a railroad terminal, or on a public street, as here, the owner has the right to expect that the contents of his luggage will not, without his consent, be exposed on demand of the police.
 
 
 28
 Arkansas v. Sanders, 442 U.S. at 767, 99 S.Ct. at 2594 (Burger, C. J., concurring).
 
 
 29
 This distinction between Solis and the present case, while relevant, is not dispositive. Had Detective Berks, utilizing only his own natural senses, been able to detect the odor of controlled substances emanating from Beale's suitcase, this would not have been a Fourth Amendment intrusion. See United States v. Solis, 536 F.2d at 881. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. at 351, 88 S.Ct. at 511.[9]
 
 
 30
 The superficially appealing analogy between the use of a canine's acute sense of smell and, for instance, mechanical enhancement devices such as flashlights[10] or binoculars[11] is, upon reflection, inapt. A trained canine's sense of smell is more than eight times as sensitive as a human's. See United States v. Solis, 536 F.2d at 881. Moreover, the dog does not amplify its handler's perception; it is an independent detection device, alerting the officer to information he would have been utterly unable to detect with his own senses. Nick's nose did not enhance Detective Berks' senses; it replaced them.[12] Accord, United States v. Bronstein, 521 F.2d at 464 (Mansfield, J., concurring); Comment, United States v. Solis: Have the Government's Supersniffers Come Down With a Case of Constitutional Nasal Congestion?, 13 San Diego L.Rev. 410, 423 (1976). Thus, the use of trained canines to monitor the contents of personal luggage cannot be analyzed as a variant of human plain view or plain smell. Cf. United States v. Leazar, 460 F.2d 982, 983-85 (9th Cir. 1972) (police officer's olfactory detection of marijuana odor in car created probable cause for arrest). Accord, United States v. Johnston, 497 F.2d 397, 398 (9th Cir. 1974); United States v. Barron, 472 F.2d 1215, 1217 (9th Cir.) (per curiam), cert. denied, 413 U.S. 920, 93 S.Ct. 3063, 37 L.Ed.2d 1041 (1973).
 
 
 31
 The molecules of contraband emanating from the interior of luggage are so subtle and incapable of human perception that a canine's detection of them constitutes an intrusion into the owner's privacy interest in the contents of the container. See Hernandez v. United States, 353 F.2d 624, 626 (9th Cir. 1965), cert. denied, 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966). The "trespassory" or "physical penetration" mode of Fourth Amendment analysis was abandoned in Katz v. United States in favor of a normative "expectation of privacy" standard. 389 U.S. at 352-53, 88 S.Ct. at 511-12; see Smith v. Maryland, 442 U.S. 735, 740-41 n.5, 99 S.Ct. 2577, 2580 n.5, 61 L.Ed.2d 220 (1979); United States v. Taborda, 635 F.2d 131, 136-39 (2nd Cir. 1980); United States v. Davis, 482 F.2d 893, 905 (9th Cir. 1973).
 
 
 32
 To paraphrase Katz, what Beale sought to exclude when he locked his suitcase was not only the intruding human eye-it was also the intruding canine nose. One who reposes his personal effects, including contraband, in a locked suitcase is surely entitled to assume that a trained canine will not broadcast its incriminating contents to the authorities.[13] See 389 U.S. at 352, 88 S.Ct. at 512. Cf. Stanley v. Georgia, 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969) ("Whatever may be the justifications for other statutes regulating (, inter alia, the sale and purchase of) obscenity, we do not think they reach into the privacy of one's own home."); id. at 571-72, 89 S.Ct. at 1251 (Stewart, J., concurring) (reaching same conclusion on Fourth Amendment grounds).
 
 
 33
 However, we do not agree with Beale that the use of drug-detecting canines is identical to the use of a magnetometer, x-ray machine, or other electronic or mechanical surveillance device, invoking the full rigors of the Fourth Amendment rubric. While x-ray scans and the use of magnetometers are "searches" subject to the full requirements of the Fourth Amendment, see United States v. Henry, 615 F.2d 1223, 1227-28 (9th Cir. 1980), we find the use of drug dogs sufficiently distinct and less intrusive to warrant a different treatment.
 
 
 34
 Drug-detecting canines may be "utilized with minimal invasion of privacy." United States v. Solis, 536 F.2d at 882. "(Their use) is distinguishable from all other search activities in that there is no risk that an innocent person's privacy will be intruded upon." 1 W. La Fave, supra, at 287. Unlike wiretapping, which is almost inherently indiscriminate, the intruding canine nose is highly discriminate. See Peebles, The Uninvited Canine Nose and the Right to Privacy: Some Thoughts on Katz and Dogs, 11 Ga.L.Rev. 75, 89 (1976). In contrast to "dragnet" detection measures, which discern all conversations, all metal objects, or all observed activity, the canine detects only contraband. "Any intrusion is minimal because the only information gleaned from the (canine) 'examination' is whether contraband is present. If an innocent person's suitcase were 'examined' by the canine, the handler would learn only that marijuana was not present." Note, Constitutional Limitations on the Use of Canines to Detect Evidence of Crime, 44 Fordham L.Rev. 973, 987 (1976) (footnote omitted). Properly trained canines are extremely reliable and any mistake is one of omission, favoring the suspect. When a dog is directed to approach luggage which does not contain the suspected contraband, the animal will not "alert," obviating the possibility of annoyance, inconvenience, harassment, and humiliation associated with unproductive surveillance of other sorts. 1 W. La Fave, supra, at 288.[14]
 
 
 35
 Therefore, we hold-consistent with the unarticulated reasoning of United States v. Solis;[15] United States v. Klein, 626 F.2d 22 (7th Cir. 1980);[16] United States v. Bronstein;[17] and United States v. Fulero[18]-that the use of a canine's keen sense of smell to detect the presence of contraband within personal luggage[19] is a Fourth Amendment intrusion, albeit a limited one that may be conducted without a warrant and which may be based on an officer's "founded" or "articulable" suspicion rather than probable cause.[20] See State v. Wolohan, 23 Wash.App. 813, 598 P.2d 421 (1979) (McInturff, J., dissenting).
 
 
 36
 Because the District Court apparently misconstrued Solis as holding that canine sniffing is not a Fourth Amendment intrusion at all, it did not make any factual or legal determination with respect to the Fort Lauderdale officers' quantum of suspicion. See Reporter's Transcript at 72-78. Rather than make this finding de novo, we prefer to remand the case to the District Court to make the necessary determinations. If the District Court finds that the Fort Lauderdale "sniffing expedition" was supported by articulable, founded suspicion, then the District Court would be correct in its prior ruling that "probable cause for (Beale's) arrest was established by the narcotic dog's actions in Florida, followed up by the narcotic dog alerting again in San Diego." Id. at 77.
 
 
 37
 If, however, the District Court finds that the Fort Lauderdale intrusion was based on a constitutionally deficient level of suspicion, it will have to revise its probable cause determination concerning Beale's arrest and the issuance of the search warrant in San Diego, excluding evidence tainted by the Florida dog sniffing.[21]
 
 
 38
 The judgment of conviction is therefore VACATED AND REMANDED, WITH INSTRUCTIONS.
 
 
 
 [1]
 Berks, based on his expertise in airport-related narcotics cases, believed that the subjects' conduct in separating upon entering the airport terminal, obtaining separate seat assignments, and looking about furtively, and their destination-a known center of drug traffic-gave rise to an inference that they were drug couriers. See generally United States v. Mendenhall, 446 U.S. 544, 563-65, 100 S.Ct. 1870, 1878-80, 64 L.Ed.2d 497 (1980) (Powell, J., concurring). But see Reid v. Georgia, 448 U.S. 438, 440-41, 100 S.Ct. 2752, 2753-54, 65 L.Ed.2d 890 (1980) (per curiam). We express no view, however, whether these facts, later circumstances, and "rational inferences" therefrom rose to the level of "founded" or "articulable" suspicion. See Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); United States v. Post, 607 F.2d 847, 849-51 (9th Cir. 1979). This determination should be made in the first instance by the District Court on remand
 
 
 [2]
 Reporter's Transcript at 73-74, 77
 
 
 [3]
 Id. at 8
 
 
 [4]
 See id. at 72 ("I think the present state of the law is that the dog search (sic) in Fort Lauderdale and here is not a search under the Fourth Amendment.")
 
 
 [5]
 Moreover, it seems to us that Bronstein's equation of the menace of drug smuggling and use with the threat of skyjacking is logically flawed. Whatever danger drugs may pose to society, see United States v. Mendenhall, 446 U.S. at 561-62, 100 S.Ct. at 1881 (Powell, J., concurring), to our knowledge no one has ever hijacked or blown up an airplane with drug-type contraband. Compare United States v. Gumerlock, 590 F.2d 794, 796-800 (9th Cir.) (en banc), cert. denied, 441 U.S. 948, 99 S.Ct. 2173, 60 L.Ed.2d 1052 (1979), and United States v. Davis, 482 F.2d 893, 910-15 (9th Cir. 1973) (Fourth Amendment constraints on pre-boarding screening security searches of passengers and carry-on baggage at airports), with United States v. Allen, 644 F.2d at 750-52, and United States v. Moore, 483 F.2d at 1362-64 (Fourth Amendment constraints on drug-motivated searches or seizures of personal luggage "checked-through" airline or retained within airport terminal)
 If the potentially "hazardous" or "dangerous" nature of a cargo is sufficient to abrogate travelers' reasonable expectation of privacy in containers being transported, the Bronstein approach would justify unrestricted roadblocks and vehicular searches, dragnet monitoring of domestic mail, and other unacceptable results. "Terry does not justify the wholesale 'frisking' of the general public in order to locate weapons and prevent future crimes." United States v. Davis, 482 F.2d at 908. "There is an obvious danger ... that the screening of passengers and their carry-on luggage for weapons and explosives will be subverted into a general search for evidence of crime." Id. at 909 (footnote omitted). The increasing use of dogs, in airports and elsewhere, to detect contraband exemplifies the "powerful hydraulic pressures" to "water down constitutional guarantees." Terry v. Ohio, 392 U.S. at 39, 88 S.Ct. at 1888 (Douglas, J., dissenting). We must be vigilant lest we succumb to those powerful pressures. See United States v. Johnson, 431 F.2d 441, 452 (5th Cir. 1970) (en banc) (Godbold, J., dissenting); cf. note 20 infra.
 
 
 [6]
 As we stated in United States v. Cleary, "the term 'personal luggage' encompasses those items commonly perceived as being designed for carrying and storing personal effects or papers and which have some sort of device to keep them closed." 656 F.2d at 1304-05 (footnote omitted)
 
 
 [7]
 We need not decide whether the use of trained canines to detect the contents of other containers constitutes a violation of the Fourth Amendment. See, e.g., United States v. Van Leeuwen, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) (parcels of mail); United States v. Choate, 576 F.2d 165, 174-80 (9th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978) (same); United States v. Mackey, 626 F.2d 684, 687 (9th Cir. 1980) (contents of paper bag); United States v. Venema, 563 F.2d 1003, 1006-07 (10th Cir. 1977) (rental storage locker); United States v. Race, 529 F.2d 12, 13-14 (1st Cir. 1976) (air cargo freight in warehouse); Doe v. Renfrow, 475 F.Supp. 1012 (N.D.Ind.1979), modified per curiam, 631 F.2d 91 (7th Cir. 1980), cert. denied, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981) (students and lockers in public schools); Bilbrey v. Brown, 481 F.Supp. 26 (D.C.D.Or.1979) (same); State v. Rogers, 43 N.C.App. 475, 259 S.E.2d 572 (1979) (safe deposit box). It bears emphasis, however, that if canine intrusions into these areas are permitted, it must be because the intrusion was reasonable or the expectation of privacy nonexistent, not because the dog's nose did not physically invade the protected area in a trespassory sense. See Katz v. United States, 389 U.S. at 352-53, 88 S.Ct. at 510-11; note 20 infra & accompanying text
 Finally, irrespective of whether canine-sniffing of luggage at a port of entry or international border is a Fourth Amendment intrusion, there is ample authority that routine searches and inspections conducted by Customs officials at the border are per se reasonable. This includes the inspection of international letter mail. United States v. Ramsey, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); see United States v. Dubrofsky, 581 F.2d 208, 211 (9th Cir. 1978).
 
 
 [8]
 "(A) person's expectations of privacy in personal luggage are substantially greater than in an automobile." 433 U.S. at 13
 
 
 [9]
 Compare Katz v. United States, 389 U.S. at 352, 88 S.Ct. at 512 (electronic eavesdropping device invades the reasonable expectation of privacy one has in a phone booth), with United States v. McLeod, 493 F.2d 1186 (7th Cir. 1974) (when telephone caller is aware of nearby third party, who overhears caller's conversation, no reasonable expectation of privacy is violated). See generally, United States v. White, 401 U.S. 745, 748-54, 91 S.Ct. 1122, 1124-27, 28 L.Ed.2d 453 (1971)
 
 
 [10]
 Under particular circumstances, we have approved certain limited use of such devices. See, e.g., United States v. Hood, 493 F.2d 677, 680 (9th Cir.), cert. denied, 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974); United States v. Walling, 486 F.2d 229, 236 (9th Cir. 1973), cert. denied, 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974); United States v. Marin, 444 F.2d 86, 87 (9th Cir. 1971) (citing Marshall v. United States, 422 F.2d 185 (5th Cir. 1970)) (use of flashlight neither validates otherwise unlawful search nor invalidates otherwise lawful search). In these cases, the sense-enhancing devices merely enabled the officers to perceive at night that which they could normally have perceived, unaided, during the day
 
 
 [11]
 In United States v. Allen, 633 F.2d 1282, 1290 (9th Cir. 1980), as amended, --- F.2d ----, No. 79-1059 (9th Cir. April 16, 1981), cert. denied, --- U.S. ----, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981), we held that the use of binoculars from a hill observation site violated no reasonable expectation of privacy. In that case, however, we also validated surveillance from a hill accomplished with the naked eye. Id. No valid analogy, however, can be drawn between Allen and the case at bar. Our decision in Allen was premised on the necessarily reduced expectation of privacy held by the defendant because of the location of the area searched. As we stated:
 The Allen Ranch is virtually on the United States sea-coast border (citations omitted), and Coast Guard helicopters routinely traversed the nearby airspace for several reasons, including law enforcement. The residents of the Allen Ranch would, no doubt, have been aware of these routine flights and any reasonable person, cognizant of the ranch's proximity to the coastline and the Coast Guard's well-known function of sea-coast patrol and surveillance, could expect that government officers conducting such flights would be aided by sense-enhancing devices.
 As such, the residents could not reasonably bear a subjective expectation of privacy from the Coast Guard's air-borne telephotographic scrutiny of the objects observed here, large scale modifications of the Allen Ranch landscape and barn.
 
 
 [12]
 Since Katz, supra, the use of independent detection devices such as magnetometers and x-ray scans has uniformly been held to constitute a search. See, e.g., United States v. Henry, 615 F.2d 1223, 1227 (9th Cir. 1980) (x-ray scan); United States v. Albarado, 495 F.2d 799 (2nd Cir. 1974) (magnetometer). While the use of independent electronic or mechanical detection devices constitutes a search, the corollary is not necessarily true in the case of sense-enhancing devices. Generally, we have limited our exemption of the use of sense-enhancing devices from the strictures of the Fourth Amendment to cases in which ordinary, commercially available devices, which citizens might expect members of the general public as well as the law enforcement community to possess, are employed and their use occurs in a location from which the ordinary citizens might otherwise observe the property or activity. Clearly, the use of some sense-enhancing devices may constitute a search. See, e.g., Katz, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576
 
 
 [13]
 We agree with the Second Circuit that "analysis of the constitutional protection to be accorded to privacy expectations is (not) significantly aided by reference to the nature of the conduct involved." United States v. Taborda, 635 F.2d at 138 n.10
 A person in his home has no greater, nor more reasonable, expectation that he will be observed by his neighbor when his conduct is criminal than when it is innocent. What varies with the nature of the activity is not the likelihood, but rather the consequences, of its being observed.
 Id. at 139 n.10. The fact that trained canines detect only contraband diminishes, but does not obliterate, the nature of the intrusion. A graduated Fourth Amendment approach may not be appropriate with other forms of detection technology.
 
 
 [14]
 Our decision is expressly premised on this concept of canine reliability and on the fact that the Government must establish the dog's reliability as part of its showing to support the issuance of a warrant or a finding of probable cause. Should either of these premises prove inaccurate, the use of dogs to sniff luggage would not be condoned by the court unless all the normal prerequisites to an ordinary search were complied with
 
 
 [15]
 "The agents had a founded suspicion (that the semi-trailer contained marijuana). Calling upon the dogs for further corroboration ... as a basis for application to a magistrate for a warrant to enter the vehicle was a reasonable course of action on the part of the agents." 536 F.2d at 882
 
 
 [16]
 (Suspicious circumstances) coupled with the agents' previous observation of defendants and the information from the Florida deputy sheriff were not enough to establish probable cause, either for an arrest or for a search of defendants' luggage, but were certainly enough to give the agents reasonable suspicion to believe that the suitcases contained contraband
 626 F.2d at 25. "(T)here is no substantial difference between the doctrine of 'founded suspicion' ... and the 'reasonable suspicion' test ...." United States v. Rocha-Lopez, 527 F.2d 476, 477 (9th Cir. 1975), cert. denied, 425 U.S. 977, 96 S.Ct. 2181, 48 L.Ed.2d 802 (1976).
 
 
 [17]
 "In view of the tip received from the airline-employee informants previously found to be reliable by the West Coast DEA agent ..., there was ample cause for the agents to pursue the lead and to place under surveillance the fully described passengers and their luggage." 521 F.2d at 461. "I would strictly limit (canine sniffing) to cases where there are grounds for (reasonable suspicion that the baggage contains contraband), similar to or stronger than that present here, and would not permit a wholesale examination of all baggage in the hope that a crime might be detected." Id. at 465 (Mansfield, J., concurring)
 
 
 [18]
 Prior to using the drug-detecting dogs, the police officer in Fulero had reasonable suspicion, based on the totality of circumstances, that the footlockers contained contraband. See 498 F.2d at 748-49. See also People v. Lester, 101 Cal.App.3d 613, 161 Cal.Rptr. 703, cert. denied, 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980); People v. Furman, 30 Cal.App.3d 454, 106 Cal.Rptr. 366 (1973)
 
 
 [19]
 In the present case, the luggage sniffed was located in an airport baggage room removed from the vicinity of its owners and other travelers. There was no possibility that the dog would alert to contraband being carried on a person. Thus we do not confront the constitutional problem which would be presented if law enforcement officers sought to use highly trained canines to sniff luggage in close proximity to people. See last part of note 20, infra, and Solis, 536 F.2d at 883 ("There was no embarrassment to or search of the person.")
 
 
 [20]
 To the extent that United States v. Burns, 624 F.2d 95, 101 (10th Cir.), cert. denied, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980); United States v. Sullivan, 625 F.2d 9, 12-13 (4th Cir. 1980), cert. denied, 450 U.S. 923, 101 S.Ct. 1374, 67 L.Ed.2d 352 (1981); and United States v. Goldstein, 635 F.2d 356, 360-62 (5th Cir.), cert. denied, 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981), depart from this unstated rationale, we decline to follow them. As stated earlier in this opinion, after Katz, Chadwick, and Arkansas v. Sanders, it is not tenable to assert that "(t)here can be no reasonable expectation of privacy when any passenger's bags may be subjected to close scrutiny for the protection of public safety," Sullivan, 625 F.2d at 13, or that "the olfactory activities of a trained police dog legitimately on the premises do not constitute a search." Burns, 624 F.2d at 101. Nor do we agree with either the formulation or the conclusion that "the passenger's reasonable expectation of privacy does not extend to the airspace surrounding (his) luggage." Goldstein, 635 F.2d at 361. See note 5 supra & accompanying text; text accompanying notes 8-13 supra
 We are mindful that Professor Amsterdam might view our holding as a "sliding scale" application of Fourth Amendment principles that may gradually dilute its protections in critical respects. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 393 (1974). We do not intend any dilution. The rule we adopt here sets forth a minimum level of Fourth Amendment "entitlement." In situations less pervasively regulated than airports, it may be that a person's reasonable expectation of privacy in his luggage is greater, warranting a correspondingly more protective analysis of the "intrusion" issue. And it goes without saying that the alternative to random checkpoint stops cited in Delaware v. Prouse, i.e., "(q)uestioning ... all oncoming traffic at roadblock-type stops," 440 U.S. 648 at 663, 99 S.Ct. 1391 at 1401, 59 L.Ed.2d 660, is totally unpalatable in the canine sniffing context. Nothing would invoke the spectre of a totalitarian police state as much as the indiscriminate, blanket use of trained dogs at roadblocks, airports, and train stations. See generally Terry v. Ohio, 392 U.S. 1, 38-39, 88 S.Ct. 1868, 1888, 20 L.Ed.2d 889 (1968) (Douglas, J., dissenting); United States v. Bronstein, 521 F.2d at 465 (Mansfield, J., concurring); 1 W. La Fave, supra, at 286. Similarly, the use of dogs to sniff people, rather than objects, is highly intrusive and is normally inconsistent with the concepts embodied in our Constitution. We would not preclude, however, the use of a trained canine who sniffs from a distance as an alternative where a more intrusive strip search or search of the body cavities is justified.
 
 
 [21]
 See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Cella, 568 F.2d 1266, 1284-87 (9th Cir. 1977); note 1 supra