STATE OF HAWAII, Plaintiff-Appellant, *v.* CONRAD NIKOLI GROVES, Defendant-Appellee

NO. 8250

(CRIMINAL NO. 54539)

JULY 14, 1982

RICHARDSON, C.J., LUM, NAKAMURA, PADGETT AND HAYASHI, JJ.

## OPINION OF THE COURT BY HAYASHI, J.

This appeal is brought by the plaintiff-appellant, the State of Hawaii (appellant hereinafter), from an order issued by the Honorable Simeon R. Acoba, Jr., Judge of the First Circuit Court, State of Hawaii. That order, filed on April 28, 1981, granted the defendant-appellee, Conrad Nikoli Groves' (appellee hereinafter), motion to suppress marijuana and LSD papers which were recovered from a search of the appellee's clothing and luggage. We affirm the suppression of the LSD paper found on appellee's clothing and reverse the suppression of the LSD paper and marijuana found in appellee's luggage.

The following facts were established at the hearing on the motion to suppress. On the morning of May 23, 1980, Robert J. Moloney, a co-pilot with the interisland airline Air Hawaii, noticed an odor that he believed to be marijuana emanating from a suitcase he was unloading from the compartment of the airplane[1] which he had just co-piloted on a flight from Kauai. He notified the airline front counter supervisor, Keith Briton, who called the Honolulu Police Department (HPD). Jerry Snyder, an agent of the Drug Enforcement Administration (DEA) took the phone call and dispatched Detective Gary Kim, a HPD narcotics officer assigned to an airport task force, and HPD Officer Preston Abe to the Air Hawaii terminal to investigate. Mr. Briton informed the officers of the co-pilot's suspicions about the suitcases which had by then been stored in a room to the rear of Air Hawaii's business counter. Mr. Briton then pointed out the appellee to the officers.

Detective Kim approached the appellee, displaying his police badge, and told the appellee that he had reason to believe there was

---

[1] It was established at the suppression hearing that the unloading of luggage was one of the duties of co-pilot Robert Moloney.

illegal contraband in his luggage and asked for his cooperation in the investigation. The appellee was informed of his constitutional rights but was told that he was not under arrest at that time. Asked by Detective Kim whether the bags were his, the appelle responded in the affirmative. The appellee then accompanied the officers to the HPD-DEA office. While there, Detective Kim noticed a strong odor of marijuana emanating from the appellee's luggage.

Twenty minutes later, DEA Agent Snyder arrived at the HPD-DEA office. Agent Snyder asked the two HPD officers if the appellee had been searched, and they replied in the negative. Agent Snyder then asked the appellee to stand up, patted him down, and asked the appellee to remove everything from his pockets. Appellee removed several items from his left front shirt pocket, among them, paper later discovered to be saturated with LSD. At that point, Detective Kim asked the appellee if he would sign an HPD consent to search form, but he refused. Upon further questioning, the appellee stated that if he let the officers open his bags, they might find some marijuana but that he had some mangoes in them. Detective Kim repeated his request to the appellee to sign the HPD consent form, but appellee again refused. Upon further questioning, the appellee indicated that he didn't have a permanent address. At that point, the officers placed appellee under arrest and informed him of his constitutional rights.

Soon thereafter, Detective Kim summoned Harvey Hisatake, a police officer assigned to a special narcotic unit stationed at the airport. Officer Hisatake brought along the HPD narcotics detection dog, Max, to check the luggage belonging to the appellee. After the appellee's luggage was relocated in different parts of the office, Officer Hisatake led Max on a search pattern in an attempt to locate any luggage containing contraband. The dog, Max, alerted Officer Hisatake[2] to the two suitcases belonging to the appellee. After this identification, the appellee was arrested for a second time.

The suspected suitcases were kept in the possession of Officer Abe who obtained a search warrant from District Court Judge Edwin Honda the following day. The warrant was issued based on

---

[2] At the suppression hearing, Officer Hisatake testified that Max would "alert" him to narcotics by scratching, biting and growling at a suspected suitcase.

affidavits recounting the statements of the co-pilot Robert Moloney, Officer Abe, and Officer Hisatake. The search of the suitcases resulted in the discovery of a large quantity of marijuana sticks and dark blue blotter-type paper later determined to be saturated with LSD. After this evidence was discovered, the appellee was arrested for a third time while he was being held at a police cellblock.

On July 29, 1980, a three-count indictment was handed down against the appellee. Count I charged the appellee with the promotion of a detrimental drug in the first degree, in violation of Hawaii Revised Statutes (HRS) § 712-1247(1)(e),[3] for the marijuana found in his luggage. Count II charged the appellant with the promotion of a dangerous drug in the third degree, in violation of HRS § 712-1243,[4] for the LSD papers found on the appellee's person. Count III is similar to Count II, but pertains to the LSD papers found in his suitcase.

On December 23, 1980, the appellee filed a motion to suppress the evidence seized from his person and suitcases. In the memorandum in support of that motion, the appellee argued that the search of his body was not incidental to his arrest because he had not been placed under arrest at the time of the search. As for the search of his suitcases, the appellee argued that the search warrant was not validly issued because no probable cause to search had been demonstrated. At the suppression hearing of March 17, 1981, Judge Acoba orally ruled that the LSD papers found in the search of the appellee's person were to be suppressed because the search was not incident to a valid arrest. Judge Acoba also suppressed the LSD paper and the marijuana seized from the appellee's luggage, ruling that there was

---

[3] HRS § 712-1247(1)(e) provides:
*Promoting a detrimental drug in the first degree.* (1) A person commits the offense of promoting a detrimental drug in the first degree if he knowingly:
   (e) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of two and two-tenths pounds or more, containing any marijuana;

[4] HRS § 712-1243 provides:
*Promoting a dangerous drug in the third degree.* (1) A person commits the offense of promoting a dangerous drug in the third degree if he knowingly possesses any dangerous drug in any amount.
   (2) Promoting a dangerous drug in the third degree is a class C felony.

insufficient basis for the issuance of the search warrant. Specifically, Judge Acoba ruled that the affidavits presented to the magistrate did not constitute probable cause and that the use of the dog, Max, was itself a search which required a warrant.

## I.

We address first the legality of the search conducted on the appellee's person while he was being detained at the HPD-DEA office. The appellant first argues that the search was legal because it was incident to a valid arrest. In support of this contention, the appellant cites this court's decision in *State v. Delmondo,* 54 Haw. 552, 512 P.2d 551 (1973), for the proposition that the magic words, "I put you under arrest," are not necessarily required for there to have been a valid arrest. It argues that under the facts of this case, the appellee had been placed under arrest because he was not free to leave the HPD-DEA office and because the officers possessed sufficient probable cause for the arrest.

It is well-established that warrantless searches are presumed unreasonable unless they fall within one of the narrowly-defined exceptions. *Coolidge v. New Hampshire,* 403 U.S. 443, 454-55 (1971); *Katz v. United States,* 389 U.S. 347, 357 (1967); *State v. Elderts,* 62 Haw. 495, 498, 617 P.2d 89, 92 (1980); *State v. Rosborough,* 62 Haw. 238, 240-41, 615 P.2d 84, 86 (1980); *State v. Kender,* 60 Haw. 301, 307, 588 P.2d 447, 451 (1978); *State v. Patterson,* 58 Haw. 462, 467, 571 P.2d 745, 748 (1977). Furthermore, the government must bear the burden of justifying warrantless seizures. *Chimel v. California,* 395 U.S. 752, 762 (1969); *State v. Rosborough, supra,* at 241, 615 P.2d at 86; *State v. Dias,* 62 Haw. 52, 57, 609 P.2d 637, 641 (1980). One type of search exempt from the warrant requirement is that conducted incident to a valid arrest. We have held that after a valid arrest has been made, a contemporaneous search may be made for the fruits of the crime, implements used to commit the crime, and for weapons. *State v. Jenkins,* 62 Haw. 660, 665, 619 P.2d 108, 112 (1980); *State v. Park,* 50 Haw. 275, 276, 439 P.2d 212, 213 (1968).

In the present case, no valid arrest had taken place before the search of the appellee's person was conducted. At the March 4, 1981, suppression hearing, Officer Kim testified that he did not place the

appellee under arrest at the time he approached him at the Air Hawaii terminal. Instead, Officer Kim informed the appellee that he was conducting an investigation about suspected illegal contraband in his luggage and asked appellee for his cooperation. From this testimony, we find that Officer Kim had not placed appellee under actual arrest nor had he exhibited the type of action which would have conveyed to appellee that he was being arrested. The testimony of the appellee at the March 17, 1981, suppression hearing confirms this finding. At that hearing, appellee testified that he believed he was first arrested after he was searched.

In *State v. Delmondo, supra,* we held that the absence of the words, "I place you under arrest," did not preclude an arrest from occurring where an officer's action makes it clear to the defendant that he is not free to go. 54 Haw. at 557, 512 P.2d at 554. In *Delmondo,* a police officer found to have had probable cause to arrest took custody of the defendant and a cohort by ordering them to leave a toilet stall, stand up against a wall, and remain subject to his commands. A search was then conducted and an illegal drug capsule was recovered from the defendant's left hand. Under those circumstances, we held that the action of the police officer constituted an arrest justifying the subsequent warrantless search.

In this case, the actions of Officer Kim did not constitute an arrest and thus the subsequent body search of the appellee by Agent Snyder could not be justified as incident to a valid arrest.

Alternatively, the appellant argues that the search was conducted with the consent of the appellee. In support, the appellant cites to the fact that the appellee voluntarily accompanied the officers to the HPD-DEA office. The appellee answers that there was no consent to a search, rather that there was a mere surrender of the contents of his pockets to a searching authority. As support, the appellee cites the case of *State v. Kaluna,* 55 Haw. 361, 371, 520 P.2d 151, 160 (1974) wherein we held that the mere surrender of personal possessions to a searching authority does not constitute a knowing waiver of the right to be free from unreasonable searches and seizures. Here, as in *Kaluna,* we find that the appellee's emptying of his pockets was a submission to the authority of Agent Snyder who had already ordered the appellee to stand up and submit to a frisk. For this reason, we find that the appellee did not consent to the search.

For the foregoing reasons, we hold that the LSD paper recovered from the search of the appellee was properly suppressed.

## II.

The appellant's second point on appeal challenges the suppression of the LSD paper and marijuana recovered from the court-sanctioned search of the appellee's suitcases and raises important constitutional issues relating to the application of the Fourth Amendment. At the suppression hearing, Judge Acoba granted the motion to suppress on two grounds. The first was based on a finding that the use of the dog, Max, constituted an illegal warrantless search of the appellee's suitcases. The second was based on a finding that the affidavit of the co-pilot Moloney did not constitute sufficient probable cause for the issuance of the search warrant.

We address first the issue of whether the use of the dog, Max, constituted an illegal search of the appellee's suitcases. We have stated that whether actions by law enforcement officials constitute an illegal search and seizure depends on whether the person possesses a reasonable expectation of privacy. This is determined by asking whether (1) a person exhibits an actual expectation of privacy and (2) whether the expectation was one which society would deem reasonable. *State v. Texeira*, 62 Haw. 44, 48, 609 P.2d 131, 134-35 (1980); *State v. Dias, supra*, at 55, 609 P.2d at 639; and *State v. Kender, supra* at 303, 588 P.2d at 449. In this case, Judge Acoba ruled that the use of the dog, Max, constituted an illegal warrantless search because the appellee possessed an expectation of privacy in the suitcases which encompassed the smells emanating from the interiors.

In *State v. Rosborough, supra*, this court declared that "luggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." *Id.* at 241, 615 P.2d at 86. Judge Acoba cited the *Rosborough* decision as authority for his decision to grant the appellee's motion to suppress. We reaffirm the general proposition we established in *Rosborough*, i.e., that people normally possess an expectation of privacy in luggage. However, an examination of the facts of this case leads us to conclude that the use of Max was not an unreasonable Fourth Amendment search.

We note initially that the marijuana odors which emanated from

appellee's suitcases were readily detectable by the human nose. At the suppression hearing, Robert Moloney, Officer Abe, and Detective Kim all testified that they smelled marijuana odors originating from appellee's suitcases. These odors were not constitutionally protected for we have previously held that what a person knowingly exposes to the public is not a subject of Fourth Amendment protection. *State v. Ward*, 62 Haw. 509, 512, 617 P.2d 568, 570 (1980); *State v. Dias, supra*, at 56, 609, P.2d at 640; and *State v. Texeira, supra*, at 49, 609 P.2d at 135. Clearly, the officers' sniffing of the air surrounding appellee's suitcases did not constitute a Fourth Amendment intrusion. *See United States v. Beale*, 674 F.2d 1327, 1333 (9th Cir. 1982); *United States v. Goldstein*, 635 F.2d 356, 361 (5th Cir.), *cert. denied*, 452 U.S. 962 (1981); *United States v. Sullivan*, 625 F.2d 9, 13 (4th Cir. 1980), *cert. denied*, 450 U.S. 923 (1981). Based on their own verification of Moloney's tip, the officers possessed probable cause to seek a search warrant. *See State v. Dorson*, 62 Haw. 377, 385, 615 P.2d 740, 746 (1980). If in this case the search warrant application was based on the officers' own smelling of the marijuana odors, there would be no question as to the validity of the issuance of the warrant. However, the search warrant application only included affidavits describing Robert Moloney's tip and the verification of the marijuana odor by Officer Hisatake and Max. For some unexplained reason, the warrant application contained no mention of Officer Abe's and Detective Kim's personal smelling of the marijuana odors emanating from appellee's suitcases. This omission requires us to consider the question of the legality of the use of Max.

Numerous courts have dealt with the question of the legality of narcotics-sniffing dogs and all of them have sanctioned their use. The rationales justifying their use have varied from jurisdiction. Some courts have based their decision on a "plain smell" analysis akin to the "plain view" Fourth Amendment exception. Another court based its decision on the premise that there exists a lesser expectation of privacy in luggage that is placed in the hands of a common carrier. A few courts have based their decisions on a combination of the two aforementioned rationales. Yet in all of these cases, the courts have concluded that the use of narcotics-sniffing dogs did not constitute searches within the meaning of the Fourth Amendment.

Recently, one court ruled that the use of narcotics-sniffing dogs

is a Fourth Amendment search, albeit a limited one that can be conducted without a warrant when based on a reasonable suspicion of criminal activity. *United States v. Beale, supra.* This decision, which utilizes a different approach to the narcotics-sniffing dog question, is one we decline to follow.[5]

We believe that the more legally sound approach is represented by those cases which are based on the premise that there can be no reasonable expectation of privacy in the airspace surrounding a person's luggage. *See United States v. Goldstein, supra,* at 361; *United States v. Venema,* 563 F.2d 1003, 1005 (10th Cir. 1977); *United States v. Bronstein,* 521 F.2d 459, 461 (2d Cir.), *cert. denied,* 424 U.S. 918 (1975); *United States v. Folero,* 162 U.S. App. D.C. 206, 498 F.2d 748 (1974); *State v. Morrow,* 128 Ariz. 309, 312-13, 625 P.2d 898, 902 (1981); *People v. Mayberry,* 644 P.2d 810, ____ (Ca. 1982); *State v. Goodley,* 381 So.2d 1180, 1182 (Fla. Dist. Ct. App. 1980); and *People v. Price,* 54 N.Y.2d 557, ____, 446 N.Y.S.2d 906, 909 (1981).

The rationale supporting a rule that a person's expectation of privacy in luggage is limited to the contents and not the smells emanating from luggage was best stated in *People v. Price, supra.* In that case, the New York Court of Appeals reasoned as follows:

Since the dog does nothing more than smell the air surrounding the luggage in order to detect odors emanating from that luggage, there was no intrusion or search of the luggage. Defendant must assert a reasonable expectation that the air surrounding his luggage and the odor apparent in that surrounding air will remain private. In such circumstances, the Fourth Amendment affords no protection.

■ Such an expectation of privacy is not supported by simple logic, analogous precedent or by the conduct of others similarly situated to the defendants. It is logically simplistic that once one releases someting into the open air, there can be little reasonable expectation of asserting one's claims of privacy in either the item itself or in the surrounding air. . . . . Just as there is no reasonable expectation of privacy in items left in the plain view of an officer lawfully in the position from which he observes the item

---

[5] Although we decline to follow the reasoning utilized in *United States v. Beale,* it should be noted that even under that case, the use of Max would have been allowed.

*(see, e.g., Harris v. United States,* 390 U.S. 234, 88 S. Ct. 992, 19 L.Ed.2d 1067), there can be no reasonable expectation that plainly noticeable odors will remain private.
446 N.Y.S.2d at 909.

In adopting the rationale of the *Price* decision, we reject the appellee's contention that he possessed a reasonable expectation of privacy in the marijuana odors coming from his suitcase. The distinction between an expectation of privacy in the contents as opposed to the odors emanating from luggage distinguishes this case from our decision in *State v. Rosborough, supra.*

Additionally, we find that the use of dogs such as Max poses very few of the threats generally associated with the Federal and Hawaii constitutional proscriptions against unreasonable searches and seizures. As was noted by the Illinois Supreme Court in *People v. Campbell,* 67 Ill.2d 308, 317, 367 N.E.2d 949, 953-54 (1977), *cert. denied,* 435 U.S. 942 (1978):

> [T]he use of trained dogs to detect the odor of marijuana poses no threat of harassment, intimidation or even inconvenience to the innocent citizen. Nothing of an innocent but private nature and nothing of an incriminating nature other than the narcotics being sought can be discovered through the dog's reaction to the odor of the narcotics.

While we today hold that the use of narcotics-sniffing dogs does not, in and of itself, constitute an illegal search, this decision is not to be read as a carte blanche sanctioning of all uses of these dogs. There may be situations in which the use of these dogs will be deemed unreasonable. *See, e.g., Horton v. Goose Creek Independent School District,* 677 F.2d 471 (5th Cir. 1982) (Held: canine sniffing of high school students violated the students' Fourth Amendment rights where school district officials justified the searches only on the basis of claimed need to prevent drug and alcohol abuse). For as one noted commentator has written:

> Totally unrestrained use of trained dogs, it is submitted, would not be consistent with the kind of open society to which we are committed. It would be intolerable if the police, in no way limited by the Fourth Amendment, were free to utilize dogs to undertake "a wholesale examination of all baggage in the hope that a crime might be detected" or "to roam the streets at will with trained dogs or sensor instruments, detecting the odor of mari-

juana and arresting persons at will as a result." [Footnotes omitted.]

1 W. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment,* § 2.2(f), at 286 (1978).

Accordingly, the legality of the use of narcotics-sniffing dogs will depend on the circumstances of the particular case. This court will not condone the use of these dogs in general exploratory searches or for indiscriminate dragnet-type searches. *See United States v. Beale, supra,* at 1336, n.20; *United States v. Klein,* 626 F.2d 22, 27 (7th Cir. 1980); *United States v. Bronstein, supra,* at 465 (Mansfield, J., concurring). Furthermore, as a constitutional minimum, we will require that the dog and its handlers be fully qualified.[6] *See United States v. Beale, supra,* at 1335, n.14; *United States v. Klein, supra,* at 27; *United States v. Venema, supra,* at 1007; *People v. Mayberry, supra,* at ___; *People v. Campbell, supra,* at 954. When these requirements are met, the results of a "dog-sniff" can be brought to a neutral magistrate in an application for a search warrant. We wish to make clear that a positive alert by a narcotics-sniffing dog does not obviate the need for a search warrant. *See State v. Dorson, supra,* at 385.

In applying the rule we adopt today to the facts of this case, we have no problem in sanctioning the use of the dog, Max, to sniff out appellee's suitcases. First, the facts clearly show that Max was not used for a general exploratory search. A telephone tip by an identified citizen informant provided Officer Abe and Detective Kim with at least "reasonable suspicion" that criminal activity was afoot.[7] These officers' subsequent smelling of the marijuana odors from appellee's suitcases provided them with probable cause to seek a search warrant. The summoning of the dog, Max, to corroborate their already strong suspicions was clearly justified under the circumstances. Second, in examining the affidavits accompanying Officer Abe's search warrant application, we find that there was an

---

[6] By qualified, we refer to officers and dogs who have participated in established drug enforcement programs. In these programs, the officers are instructed in handling these dogs who are specifically trained in the detection of different narcotics.

[7] This is the standard for justification of investigatory stops. *See State v. Melear,* 63 Haw. 488, 630 P.2d 624 (1981); *State v. Powell,* 61 Haw. 316, 603 P.2d 143 (1979); *State v. Bonds,* 59 Haw. 130, 577 P.2d 781 (1978); and *State v. Barnes,* 58 Haw. 333, 568 P.2d 1207 (1977).

adequate showing made of Officer Hisatake's and Max's expertise and prior narcotic investigation experiences to establish that both were "fully qualified."[8] We, therefore, hold that Max's alerting onto appellee's suitcase did provide sufficient probable cause for the issuance of the search warrant.

### III.

Having decided that the information provided by the dog, Max, was sufficient to provide Officer Abe with the requisite probable cause to seek a search warrant, the question of whether Robert Moloney's tip alone would have provided sufficient probable cause for a warrant need not be answered by us.

### CONCLUSION

For all of the foregoing reasons, the trial court's order suppressing the LSD paper recovered from the body search of the appellant is affirmed while the order suppressing the marijuana and LSD paper from the suitcases is reversed.

*Lila B. LeDuc,* Deputy Prosecuting Attorney *(Arthur E. Ross* on the opening brief), for plaintiff-appellant.

*Winston Mirikitani* for defendant-appellee.

---

[8] The affidavit described Officer Hisatake and Max's qualifications and experiences as follows:

That your "affiant" further learned from Officer Harvey HISATAKE that he has been a Canine Handler with the Honolulu Police Department, City and County of Honolulu, State of Hawaii, for one (1) year and nine (9) months; that his assigned canine "Max" has been used by the Honolulu Police Department, City and County of Honolulu, State of Hawaii, for one (1) year and nine (9) months and has been instrumental for sixty-four (64) seizures of heroin, cocaine, and marijuana, resulting in twenty-nine (29) arrests for State drug offenses.