**Electronically Filed
Supreme Court
SCWC-23-0000388
16-SEP-2025
09:33 AM
Dkt. 29 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent and Petitioner/Plaintiff-Appellee,

vs.

JONATHAN P. SPIES,
Petitioner and Respondent/Defendant-Appellant.

SCWC-23-0000388

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-23-0000338; CASE NO. 3CPC-21-0001004)

SEPTEMBER 16, 2025

RECKTENWALD, C.J., MCKENNA, EDDINS, AND GINOZA, JJ.,
AND CIRCUIT JUDGE MEDEIROS IN PLACE OF DEVENS, J., RECUSED

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.    INTRODUCTION

Hawai'i County Police obtained a search warrant for the person of Jonathan P. Spies, based on information that he was dealing narcotics.  Police stopped Spies while he was driving his pickup truck, executed the warrant, and found nothing on his

person. Following the search, the officer asked for consent to search the truck. Rather than saying "yes" or "no," Spies responded, "It[']s all in there." The officer continued questioning Spies, who made additional incriminating statements. Spies was then arrested. At no point prior to his arrest was Spies informed he was free to go or that he was not required to answer the officer's questions. Nor was Spies informed of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). When the pickup truck was searched pursuant to a subsequently obtained warrant, police recovered over an ounce of methamphetamine.

Following a jury trial, Spies was convicted on a single count of Promoting a Dangerous Drug in the First Degree in violation of Hawaiʻi Revised Statutes (HRS) § 712-1241(1)(a) (Supp. 2016).[1] Spies appealed his conviction on multiple grounds, including challenges to his continued detention

---

[1] HRS § 712-1241 provides in relevant part:

> (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
>
> (a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
>
> (i) One ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers; or
>
> (ii) One and one-half ounce or more, containing one or more of any of the other dangerous drugs[.]

2

following the execution of the search warrant and the voluntariness of his statements to the arresting officer.  The Intermediate Court of Appeal (ICA) vacated Spies's conviction on the basis that there was insufficient foundation as to the State's expert witness' qualification to testify to the result of scientific tests performed on the methamphetamine.  According to the ICA, the State did not show that its expert was trained in accordance with the laboratory device manufacturer's requirements.  Otherwise, the ICA affirmed the circuit court.

Both the State of Hawai'i and Spies sought certiorari review.  First, we hold the ICA erred in determining the State offered insufficient foundation to support the admission of the test results.  Next, we address the continued detention of Spies after the search of his person turned up no incriminating evidence.  We adopt the rule articulated by the Ohio Supreme Court in State v. Robinette, 653 N.E.2d 695, 699 (Ohio 1995), rev'd on other grounds, Ohio v. Robinette, 519 U.S. 33 (1996), that once the reason for the stop is over, the suspect should be informed they are free to leave, unless there are additional articulable facts giving rise to a suspicion of illegal activity justifying an extension of the detention.

Here, it is undisputed that Spies was not told that he was free to go.  However, based on the information known to the

3

officer, and the circumstances of the stop, there was a reasonable basis to suspect that narcotics were in the truck. Accordingly, a brief extension of Spies's detention to confirm or dispel that suspicion was warranted.  And, asking Spies a yes or no question -  whether he would consent to a search – was not reasonably likely to result in an incriminating response.  Thus, his initial response, "It[']s all in there," was admissible and was sufficient to justify Spies's subsequent arrest and the obtention of the search warrant for his truck.  While the questions that followed the request to search violated <u>Miranda</u>, Spies's responses to those questions were cumulative and therefore harmless.

As set forth below, we conclude that Spies's other contentions on appeal lack merit.  Accordingly, we affirm his conviction.

## II.  BACKGROUND

### A.  Factual Background

On February 14, 2021, Spies was stopped by Officer Landon Takenishi, a patrol officer with the Hawaiʻi Police Department (HPD), as he stepped out of his Chevrolet pickup truck in the Foodland parking lot in Waimea.  At the time Spies was stopped, Sierra Valderrama was in the passenger seat of the truck.

Officer Takenishi asked Spies to wait while backup arrived. Spies remained by the bed of the truck while Valderrama remained in the vehicle. Within one minute of Spies's detention, Officer Justin Gaspar and Detective Chad Taniyama, both plain-clothed officers with HPD's Vice Section, arrived on the scene. Officer Gaspar informed Spies that he had a search warrant for Spies's person, which Office Gaspar then executed.

The search warrant for Spies's person was obtained following a controlled purchase by a confidential informant who purchased substances from Spies at his residence that subsequently tested positive for heroin in a field test by Officer Gaspar. Based on the same controlled purchase, a search warrant was also obtained for Spies's home. It appears that the search warrant for Spies's home was never executed. A search warrant was not obtained for Spies's vehicle based on the controlled purchase.

While Officer Gaspar executed the search warrant, Officer Takenishi asked Valderrama to exit the vehicle and questioned her about her identity and her relationship to Spies. Because Officer Gaspar and Detective Taniyama were both dressed in plain clothes, the only body camera footage is from the perspective of Officer Takenishi. The body camera did not

capture the search of Spies's person or the audio for Officer Gaspar's conversation with Spies.

The execution of the search warrant returned no evidence of contraband or wrongdoing. At Spies's request, Officer Gaspar retrieved the search warrant and reviewed it with Spies. Suspecting that incriminating evidence may be found in Spies's pickup truck, Officer Gaspar then asked for Spies's consent to search the pickup truck. In response to the request for consent to search the pickup truck, the following exchange occurred: Spies stated either "It[']s all in there" or "Everything that you guys are looking for is in there."[2] Officer Gaspar, seeking clarification asked, "What?" Spies answered "something to the effect of 'It's in the black wallet' and referred to the center console" of the pickup truck. From the execution of the search warrant to Spies's incriminating statements, Spies was detained no more than three minutes. At no point did Spies give consent to search the truck. Nor was Spies at any point informed of his rights as required under Miranda, or that he was free to go.

_____

[2] In its Order Re: State's Motion to Determine the Voluntariness of Defendant's Statements, the circuit court found, based on Officer Gaspar's testimony at a January 20, 2023 voluntariness hearing, that Spies said "It[']s all in there." However, at trial, Officer Gaspar testified that Spies said, "Everything that you guys are looking for is in there."

Following Spies's incriminating statements, Officer Gaspar arrested both Spies and Valderrama.[3]  Spies's pickup truck was impounded and towed to the South Kohala Police Station.  There, drug detector dog Rory, accompanied by Rory's HPD handler, Officer Stephen Kishimoto, performed a canine sniff of the air around the vehicle, during which Rory alerted to the presence of narcotics within the pickup truck.  A search warrant was then issued for Spies's pickup truck based in part on Rory's alert.  During the execution of the search warrant, Detective Taniyama recovered 10 clear plastic zip packets of a substance later determined to be methamphetamine from a black zippered wallet in Spies's pickup truck.[4]

Following the recovery of the methamphetamine in the pickup truck, Officer Gaspar interviewed Spies at the South Kohala Police Station.  Spies was informed of his Miranda rights, waived his right to have an attorney present, and consented to be interviewed.  During the interview, Spies made

---

[3]     Sierra Valderrama was charged with Promoting a Dangerous Drug in the First Degree and Hindering Prosecution in the First Degree for her involvement in the events described above.  Valderrama agreed to plead guilty to Hindering Prosecution and to give testimony against Spies in exchange for dismissal of the count for Promoting a Dangerous Drug.  Under the terms of her deferred acceptance of guilty plea, Valderrama was sentenced to serve a term of incarceration under adult probation department supervision.

[4]     The black wallet was not recovered from the center console as Spies indicated to Office Gaspar, but rather from a bag containing Sierra Valderrama's ID recovered from the passenger seat.

incriminating statements about the evidence recovered from his pickup truck and about his involvement in drug distribution.

## B.    Circuit Court Proceedings[5]

A grand jury indicted Spies on a single count of Promoting a Dangerous Drug in the First Degree in violation of HRS § 712-1241(1)(a) for knowingly possessing more than one ounce of substances containing methamphetamine.

Prior to trial, the State moved for a determination that Spies's various incriminating statements were voluntarily made.  At the voluntariness hearing, Officers Gaspar and Kishimoto testified about the execution of the search warrant on Spies's person and vehicle respectively.  Following the hearing, the circuit court granted the State's motion.  The circuit court found, inter alia, that Spies made two incriminating statements at the Foodland parking lot without Miranda warnings: (1) "It[']s all in there" and (2) "It's in the black wallet" in the truck's center console.  The court further found that Spies' incriminating statements during the police interview at the South Kohala Police Station were made following an advisement of his Miranda rights.  Ultimately, the circuit court determined that all of Spies's statements were voluntary.

---

[5]        The Honorable Judge Robert D.S. Kim presided.

Spies filed a series of pre-trial motions seeking dismissal of the case or suppression of inculpatory evidence. Spies also filed three motions in limine, only the first of which ("Motion in Limine 1"), regarding the evidentiary foundation required for the admission of scientific test results of the substance in the clear packets, is relevant here given our framing of the issues.

The circuit court entered written orders denying Spies's motions to dismiss and motions to suppress. The circuit court also denied without prejudice Spies's first motion in limine because it concluded that "we must look through and determine point by point the qualifications of the expert and the results of the expert report."

Over the course of a three-day trial, the jury saw physical evidence and heard from six witnesses called by the State to demonstrate that Spies possessed over an ounce of a substance containing methamphetamine on February 14, 2021, when he was stopped by HPD officers at the Waimea Foodland parking lot.

In addition to HPD Officer Takenishi, Detective Taniyama, and Officer Gaspar, who testified about the investigation leading up to and following Spies's arrest, as well as HPD Evidence Custodian Femaura Pike's testimony about

the chain of custody of the evidence recovered from Spies's pickup truck, the jury also heard from HPD Crime Lab criminalist Hayley Roush and former HPD Crime Lab criminalist Sophia Schiefelbein.

Roush testified about the lab's procedures, the validity of those procedures, and the Crime Lab's accreditation for testing crystalline substances. Prior to Roush's testimony, defense counsel restated on the record Spies's objections outlined in Motion in Limine 1. Defense counsel and the circuit court engaged in the following exchange:

> MR. KENNEDY: So just as housecleaning when I object I'm just gonna object as to foundation, hearsay, confrontation, and I'm not gonna make a speaking objection beyond that. I think that the issues are hashed out in the [Motion in Limine 1] itself.
>
> THE COURT: Or you can refer to Motion in Limine 1.
>
> MR KENNEDY: That's what I'll do. I'll say, "Objection, Your Honor, pursuant to Motion in Limine 1."
>
> THE COURT: Yes.

Roush testified that she joined the HPD Crime Lab in April 2021, a couple of months after the tests were conducted on the substance recovered from Spies's pickup truck. She explained that if a substance is crystalline, HPD Crime Lab first performs a series of three tests to identify the substance: (1) the color test, (2) the ultraviolet visible spectroscopy test (UV test), and (3) the Fourier-transform infrared spectrometer test (FTIR test). A separate analysis

10

using a balance is conducted to determine the weight of the substance. Roush also testified that HPD Crime Lab receives Certificates of Accreditation from an outside agency, the American Nation Standards Institute (ANSI) National Accreditation Board (ANAB), that outlines the scope of the lab's accreditation.

Over defense counsel's Motion in Limine 1 objection, the circuit court admitted into evidence a series of documents that demonstrated the devices were accredited by an outside agency; indicated that measuring devices in the lab were properly calibrated; reflected preventative maintenance was conducted on the devices, including by the manufacturer's vendor; and outlined the quality assurance checks on the three devices during the period when the drug tests were conducted.

Schiefelbein, who holds a bachelor of science in chemistry, conducted the scientific tests on the substance recovered from Spies's pickup truck.

Over objection from defense counsel, the circuit court found Schiefelbein to be "an expert in the area of controlled substances and analysis based upon her knowledge, skill, experience and training and her qualifications in the courts of the State of Hawaiʻi." During her two years at the HPD Crime Lab from 2020 to 2022, Schiefelbein completed 12 training modules on

different instruments, which included mock trials and case analyses. Throughout the training modules, HPD Crime Lab manager Kathy Pung supervised Schiefelbein. Schiefelbein was also trained through her education to use balances prior to her employment at the HPD Crime Lab as balances are "sort of a common material or item or instrument within [her] field." Schiefelbein eventually held the Criminalist 2 position and was an acting crime lab supervisor.

Schiefelbein also testified that she did not directly receive any training from the manufacturers of the testing devices -- Sartorius (balance), Agilent (UV spectrometer), or Thermo Scientific (FTIR) -- and that her training on those devices came from someone at the HPD Crime Lab. Schiefelbein further testified that she operated the FTIR device in accordance with Thermo Scientific's recommendations because her supervisor, Kathy Pung, was trained by Thermo Scientific and the HPD Crime Lab had manuals from the manufacturer that were used in the lab's accredited procedures.

Once Schiefelbein was qualified as an expert, she described the procedure of receiving the evidence, conducting the three tests, and analyzing the results. When Schiefelbein conducted the FTIR and UV tests, she determined there was a presence of methamphetamine. Using a Sartorius MCE electronic

balance, Schiefelbein determined the substance weighed 33.929 grams plus or minus .07 grams, which is the equivalent of 1.197 ounces. Over the defense's objection in accordance with Motion in Limine 1, the circuit court admitted into evidence the identity and weight of the recovered substance along with a copy of Schiefelbein's drug analyses.

The defense did not present any evidence at trial and asserted that the State failed to meet its burden to prove that Spies knowingly possessed more than one ounce of methamphetamine.

The jury unanimously found Spies guilty of Promoting a Dangerous Drug in the First Degree. On June 9, 2023, the court sentenced Spies to twenty years of imprisonment. At the sentencing hearing, the circuit court denied Spies's oral motion to stay the sentence pending appeal.

C. **Appellate Proceedings**

Spies appealed his conviction, asserting eight points of error that challenged the admission of drug analysis and testing results; the denial of multiple motions to suppress evidence; the denial of his motion to dismiss due to defective charging; and the determination that Spies's statements to Officer Gasper were voluntarily made and admissible at trial.

In an unpublished memorandum opinion, the ICA vacated Spies's conviction and remanded the case for a new trial.  It concluded that Spies's first point of error -- the State's alleged failure to lay proper foundation prior to admitting drug test results -- was dispositive.  It affirmed the circuit court as to Spies's seven other points of error.

The ICA held that "[t]he foundation for Schiefelbein's expert qualification was deficient where the record did not reflect that [Schiefelbein's] training to operate the three devices used to weigh and identify the substance was in accordance with each device manufacturer's requirements."  It noted that the State "had to show that Schiefelbein was trained in accordance with the manufacturer's requirements for the three devices used to analyze and test the substance" in order to qualify Schiefelbein as a "qualified expert through whom the evidence of drug identity and weight could be admitted as a substantive fact."  (Citing State v. Amiral, 132 Hawai'i 170, 178, 319 P.d 1178, 1186 (2014) (explaining foundation required to admit laser gun reading evidence); State v. Subia, 139 Hawai'i 62, 66, 383 P.3d 1200, 1204 (2016); Addison M. Bowman, Hawaii Rules of Evidence Manual § 702-2[5][C], at 7-22 (2024-2025 ed.)) (internal quotation marks omitted).

The ICA held that the State failed to lay such foundation.  It reasoned that although Schiefelbein testified that she was trained by the HPD Crime Lab, she was not trained by representatives from the manufacturers of the three devices used to analyze the identity and weight of the recovered substance.  The ICA also noted that the record did not reflect whether HPD's training complied with the device manufacturers' requirements or what the manufacturers' training requirements were for each device used.  Therefore, the ICA concluded, the State failed to "lay sufficient foundation to show Schiefelbein's qualifications to operate the three devices used to determine the identification and weight of the recovered substance."  It further held that the circuit court abused its discretion in admitting as substantive fact Schiefelbein's testimony that the recovered substance was 33.929 grams of methamphetamine.  The ICA also concluded that the evidence identifying the substance and its weight was critical to establishing Spies's promotion of a dangerous drug conviction such that the erroneous admission of the evidence was not harmless beyond a reasonable doubt.

The ICA rejected Spies's seven other points of error.

The State moved for reconsideration, arguing that the ICA "misapplied controlling caselaw" regarding the necessary

foundation for expert testimony on scientific test results, as compared to lay testimony on test results from a measuring device. It contended that the ICA misapplied State v. Wallace, 80 Hawai'i 382, 910 P.2d 695 (1996), and State v. Long, 98 Hawai'i 348, 48 P.3d 595 (2002), which, according to the State, do not require "the expert [to] be trained in accordance with any manufacturer's requirements."

The State also argued that the ICA overlooked State v. Texeira, 147 Hawai'i 513, 465 P.3d 960 (2020), where this court rejected the contention that foundation for expert testimony on a scientific test result must show the device was used by the expert in accordance with the manufacturer's established recommendations. The State argued it laid a sufficient foundation to establish the qualifications of Schiefelbein under Wallace, Long, and Texeira because none of those cases require that an expert be trained to use a measuring device in accordance with the manufacturer's requirements or recommendations.

The ICA denied the State's motion for reconsideration, noting that the State's arguments were not presented in its answering brief. In any case, the ICA concluded, Texeira is distinguishable from Spies's appeal because the appellant in Texeira challenged the device's operation, not the operator's

16

training as Spies challenged. It further reasoned that unlike Texeira, Spies's foundation challenge involved the first element of the three-part Long test to lay foundation to qualify a witness for expert testimony regarding scientific test results. The ICA thus concluded it "did not overlook or misapprehend any point of law or fact" when it concluded that the State failed to lay sufficient foundation to show the expert's qualifications to operate the three devices used to identify and weigh the substance recovered from Spies's pickup truck.

Spies filed an application for writ of certiorari, raising the same eight issues, seeking the exclusion of evidence on remand. The State filed a cross-application, presenting a single question: whether the ICA misapplied this court's precedent in vacating Spies's judgment of conviction and remanding for insufficient foundation as to the State's expert's qualification for the admission of scientific test results.

We accepted certiorari.

### III. STANDARDS OF REVIEW

**A.    Admission of Expert Testimony**

Hawaii Rules of Evidence (HRE) Rule 702 (2016) sets forth the requirements for qualification of an expert witness:

> **Rule 702  Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may

17

> testify thereto in the form of an opinion or otherwise.  In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

"[W]hether a witness qualifies as an expert is a matter addressed to the sound discretion of the trial court, and such determination will not be overturned unless there is a clear abuse of discretion."  Larsen v. State Sav. & Loan Ass'n, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982).  "To the extent that the trial court's decision is dependent upon interpretation of court rules, such interpretation is a question of law, which [the appellate] court reviews de novo."  Barcai v. Betwee, 98 Hawai'i 470, 479, 50 P.3d 946, 955 (2002) (citations omitted).

> It is not necessary that the expert witness have the highest possible qualifications to testify about a particular manner, but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth.  Once the basic requisite qualifications are established, the extent of an expert's knowledge of subject matter goes to the weight rather than the admissibility of the testimony.

Estate of Klink ex rel. Klink v. State, 113 Hawai'i 332, 352, 152 P.3d 504, 524 (2007) (brackets and ellipses omitted) (quoting Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 351, 944 P.2d 1279, 1294 (1997)).

18

**B.    Miranda Rights**

Discussing the constitutional protections afforded defendants by the United States Supreme Court's decision in Miranda, this court has stated that,

> the protections which the United States Supreme Court enumerated in Miranda have an independent source in the Hawai'i Constitution's privilege against self-incrimination. In determining the admissibility of custodial statements, the prosecutor must show that each accused was warned that he had a right to remain silent, that anything said could be used against him, that he had a right to the presence of an attorney, and that if he could not afford an attorney one would be appointed for him.  If these minimal safeguards are not satisfied, then statements made by the accused may not be used either as direct evidence or to impeach the defendant's credibility.
>
> Assuming, however, that the minimal safeguards are observed, the accused may waive the right to counsel, provided that such waiver is voluntarily and intelligently undertaken.  Moreover, once warned of his Miranda protections, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities.
>
> In determining whether a valid waiver of the right to counsel and the right to silence occurred, we review whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances[.]
>
> An explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the Miranda case.

State v. Henderson, 80 Hawai'i 439, 441-42, 911 P.2d 74, 76-77 (1996) (internal quotation marks, citations, brackets, and ellipsis omitted) (emphasis in original).

**C.    Motion to Suppress**

> A trial court's ruling on a motion to suppress evidence is reviewed de novo to determine whether the ruling was "right" or "wrong."  State v. Edwards, 96 Hawai'i 224, 231, 30 P.3d 238, 245 (2001) (citing State v. Jenkins,

19

> 93 Hawaiʻi 87, 100, 997 P.2d 13, 26 (2000)).  The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the statements or items sought to be excluded were unlawfully secured and that his or her right to be free from unreasonable searches or seizures was violated under the fourth amendment to the United States Constitution and article I, section 7 of the Hawaiʻi Constitution.  See State v. Wilson, 92 Hawaiʻi 45, 48, 987 P.2d 268, 271 (1999) (citations omitted).

State v. Spillner, 116 Hawaiʻi 351, 357, 173 P.3d 498, 504 (2007) (quoting State v. Kaleohano, 99 Hawaiʻi 370, 375, 53 P.3d 138, 143 (2002)).

## D.    Probable Cause Determination

> In light of article I, section 7 of the Hawaiʻi Constitution, which provides Hawaiʻi's citizens greater protection against unreasonable searches and seizures than the United States Constitution, the determination whether probable cause to arrest exists, such that Miranda warnings are warranted, is reviewed under a de novo standard on appeal.  See State v. Navas, 81 Hawaiʻi 113, 123, 913 P.2d 39, 49 (1996).

Kaleohano, 99 Hawaiʻi at 375, 53 P.3d at 143.

"Probable cause exists when the facts and circumstances within one's knowledge and of which one has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed."  State v. Detroy, 102 Hawaiʻi 13, 18, 913 P.2d 485, 490 (2003) (quoting Navas, 81 Hawaiʻi at 116, 913 P.2d at 42).

## IV.  DISCUSSION

We discuss only the following issues presented before this court: (1) whether the ICA properly vacated Spies's

20

conviction for lack of foundation for the results of the drug testing and, if not, whether Spies asserts a valid alternate basis to sustain the vacatur; (2) whether Spies was subjected to an unlawful detention following the execution of search warrant; and (3) whether the circuit court erred in determining Spies's various incriminating statements to Officer Gaspar were voluntary in the absence of a Miranda warning.  Spies's remaining challenges are without merit and are addressed only to the extent necessary to resolve the pertinent issues here.[6]

## A.    Foundation for Admission of Laboratory Test Results

We begin with the single question the State presents in its cross-application for writ of certiorari:

> Whether the ICA gravely erred when it held that the State was required to lay a sufficient foundation showing an expert was trained to operate a balance, a UV spectrometer, and a FTIR spectrometer in accordance with the requirements and recommendations of the manufacturers of those instruments, prior to the admission of test results and the expert's opinion as to the weight and identity of the substance tested, in contravention of State v. Wallace, 80 Hawai'i 382[, 910 P.2d 695] (1996), State v. Long, 98 Hawai'i 348[, 48 P.3d 595] (2002), [and] State v. Texeira, 147 Hawai'i 513[, 465 P.3d 960] (2020).

(Emphasis omitted.)

---

[6]    The other issues raised by Spies are: (1) whether exigent circumstances justified the warrantless seizure of Spies's pickup truck; (2) whether the warrant for his person was supported by probable cause; (3) whether the charging instrument's language was sufficient; (4) whether the warrant affidavit was sufficient to establish the reliability of the canine screen; and (5) whether the warrantless canine screen of Spies's pickup truck violated Kyllo v. United States, 533 U.S. 27 (2001).  Spies's arguments on these issues lack merit, and accordingly we reject them.

Relying on our opinion in Amiral, a case involving a police officer's testimony regarding a laser gun reading, and Professor Addison M. Bowman's Hawai'i Rules of Evidence Manual, the ICA held that "the State in this case had to show that Schiefelbein was trained in accordance with the manufacturer's requirements for the three devices used to analyze and test the substance, to establish foundation that Schiefelbein was a 'qualified expert.'" Absent that showing, the ICA concluded that the State failed to lay sufficient foundation for the admission of Schiefelbein's expert opinion as to the identity and weight of the substance required to sustain Spies's conviction. On this sole basis, the ICA vacated the circuit court's judgment of conviction and remanded for a new trial.

The State counters that our opinion in Texeira, not Amiral, should control. In Texeira, a case concerning the foundation for DNA evidence, we did not require the State to show that the measuring device was used in accordance with the manufacturer's recommended procedures. 147 Hawai'i at 531, 465 P.3d at 978. Instead, we clarified that proof by a preponderance of the evidence was required to establish a sufficient foundation. Id. at 532, 465 P.3d at 979 (citing State v. Gano, 92 Hawai'i 161, 172, 988 P.2d 1153, 1164 (1999) (noting that when the facts necessary for admissibility are

22

contested, the proponent of the evidence must show it is admissible by a preponderance of the evidence)); Long, 98 Hawai'i at 255, 48 P.3d at 602.

We agree with the State. As this court has explained, "a proper foundation for the introduction of a scientific test result would necessarily include expert testimony regarding: (1) the qualifications of the expert; (2) whether the expert employed 'valid techniques' to obtain the test result; and (3) whether 'the measuring instrument is in proper working order.'" Long, 98 Hawai'i at 355, 48 P.3d at 602 (quoting Wallace, 80 Hawai'i at 407, 910 P.2d at 720); Texeira, 147 Hawai'i at 531, 465 P.3d at 978 ("[T]he test for determining whether a party has laid a sufficient foundation for the admissibility of an expert's testimony as to scientific test results is that established in Long."). The ICA ruled that the State's foundation was insufficient only as to the qualified expert prong. Because the ICA added an additional burden not required by our caselaw to qualify the State's expert to testify about scientific test results, the ICA erred.

In order to provide expert testimony, which is admissible under HRE Rule 702, a three-part test must be satisfied: "(1) the witness must be qualified by knowledge, skill, experience, training or education; (2) the testimony must

23

have the capacity to assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the expert's analysis must meet a threshold level of reliability and trustworthiness." State v. Metcalfe, 129 Hawai'i 206, 227, 297 P.3d 1062, 1083 (2013). "[W]hether a witness qualifies as an expert is a matter addressed to the sound discretion of the trial court, and such determination will not be overturned unless there is a clear abuse of discretion." Larsen, 64 Haw. at 304, 640 P.2d at 288 (citations omitted).

The ICA and Bowman's Hawai'i Rules of Evidence Manual, on which the ICA relied, misstate our law. Both relied on our laser and radar gun cases, the ICA on Amiral and Bowman on Assaye, in concluding that the prosecution was required to establish their expert witness's qualification as the proponent of a scientific test result by showing that the expert's training "meets the requirements indicated by the manufacturer of the device." Bowman, Hawai'i Rules of Evidence Manual, § 702-2[5][C], at 722; State v. Assaye, 121 Hawai'i 204, 215, 216 P.3d 1227, 1238 (2009); Amiral, 132 Hawai'i at 178, 319 P.3d at 1186. However, Amiral and Assaye are inapposite here because those cases involve the requirements for admitting the testimony of a lay police officer as the proponent of scientific test results, not expert testimony. While it is true that, since State v.

24

Tailo, 70 Haw. 580, 582, 779 P.2d 11, 13 (1989), a police officer's training must "meet[] the requirements indicated by the manufacturer of the device" when testifying about laser and radar gun measurements, we made clear in Texeira that our holding in Assaye concerning officers' qualification was contingent on their status as a lay witness, and not a requirement generally for experts to testify as to the accuracy of a device.  See Texeira, 147 Hawai'i at 531, 465 P.3d at 978 (distinguishing Assaye because "the only evidence as to the reliability of the laser gun's measurement was the officer's lay testimony").

Where the proponent of scientific test results is "qualified as an expert by knowledge, skill, experience, training, or education," the State need not establish that its expert was trained in accordance with a device manufacturer's recommendations.  See HRE Rule 702.  Indeed, the State need not prove any specific training or qualification, merely that the testifying witness must establish by a preponderance of the evidence that they are "qualified . . . by knowledge, skill, experience, training, or education" to testify about scientific test results.  Id.  However, a showing that an expert's training was in accordance with a device manufacturer's recommendation

may, in some cases, be sufficient to establish their qualification under Long.

Therefore, we hold that, to lay a sufficient foundation for the admission of scientific test results through expert testimony, the State need only establish, by a preponderance of the evidence, "(1) the qualifications of the expert; (2) whether the expert employed 'valid techniques' to obtain the test result; and (3) whether 'the measuring instrument is in proper working order.'" Long, 98 Hawai'i at 355, 48 P.3d at 602. Here, however, ICA held that "the State in this case had to show that Schiefelbein was trained in accordance with the manufacturer's requirements for the three devices used to analyze and test the substance, to establish foundation that Schiefelbein was a 'qualified expert[.]'" Because the ICA added an additional burden not required by our caselaw to qualify the State's expert, the ICA erred.

As a final matter, we briefly address the burden of proof required for establishing an expert's qualification. The admissibility of expert testimony is a preliminary question. HRE Rule 104(a) (2016) ("Preliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court[.]"). "Where the preliminary facts necessary for the admissibility of evidence are disputed, the

offering party has the burden to prove facts supporting admission by a preponderance of the evidence."  State v. McGriff, 76 Hawaiʻi 148, 157, 871 P.2d 782, 791 (1994) (citing Bourjaily v. United States, 483 U.S. 171, 176 (1987)); Gano, 92 Hawaiʻi at 172, 988 P.2d at 1164 (reaffirming the preponderance of the evidence standard applied in McGriff).  Thus, based on the foregoing, we hold that, for purposes of the admission of scientific test results, a witness's "qualifi[cation] as an expert by knowledge, skill, experience, training or education" need only be established by a preponderance of the evidence.  See HRE Rule 702; Metcalfe, 129 Hawaiʻi at 227, 297 P.3d at 1083.

**1.  Application of the preponderance of the evidence standard**

We now review the circuit court's determination that the State established by a preponderance of the evidence that HPD criminalist Schiefelbein was qualified by knowledge, training, or experience to testify to the accuracy of the laboratory devices used to establish the identity and amount of methamphetamine recovered from Spies's pick truck.  We review the admission of expert testimony for abuse of discretion.  Larsen, 64 Haw. at 304, 640 P.2d at 288.

Schiefelbein performed four laboratory tests to confirm the weight and identity of the recovered substances: (1) weighing the substance using a Sartorius MCE electronic balance;

27

(2) the color test using the "Marquis" reagent;[7] (3) the UV test using an Agilent spectrometer; and (4) the molecular spectroscopy test using a Thermo Scientific Fourier Transom Infrared (FTIR) spectroscope.  Evidence adduced at trial showed that Schiefelbein was trained and experienced in operating the electronic balance, the UV spectrometer, and the FTIR spectroscope, was familiar with how the devices operated, and operated the devices in accordance with international accreditation standards.[8]

Regarding the Sartorius MCE electronic balance, Schiefelbein testified that she had received training in how to properly operate the device both through her education and through her employment in the HPD Crime Lab, and that she used the electronic balance daily.  Further, testimony was adduced that the laboratory's testing procedures were accredited yearly.

_____

[7] The ICA did not address the "Marquis" reagent test.  The reagent test is a "presumptive screening test" that changes color when the reagent is added to the substance.  The color of the result is then cross-referenced with a textbook to determine the presumptive identity of the tested substance.  Because the presumptive test was not relied upon as a substantive fact as to prove the composition of the recovered drugs, see Subia, 139 Hawai'i at 66, 383 P.3d 1204, and was only used determine which test to run next, we do not address it further here.

[8] The record reflects that the HPD Crime Lab's procedures for operating the Sartorius MCE electronic balance, the UV test using an Agilent spectrometer, and the molecular spectroscopy test using a Thermo Scientific FTIR spectroscope were all accredited by the ANAB, which "is a private, non-profit organization that administers and coordinates the U.S. voluntary standards and conformity assessment system." About ANSI, ANSI, https://www.ansi.org/about/introduction/ [https://perma.cc/T82T-M3AR].

Finally, the electronic balance was regularly calibrated and certified weights were used to verify the calibration daily.

Regarding the Agilent UV spectrometer, Schiefelbein testified that she was trained to operate the device by her supervisor, and that the UV tests were performed in compliance with her training and accredited laboratory procedures. Further, maintenance and accreditation logs were admitted into the record to show the UV spectrometer was in proper working order at the time Schiefelbein conducted the UV test.[9]

Regarding the Thermo Scientific FTIR spectroscope, which is used to confirm a substance's composition through comparison against a standardized reference library, Schiefelbein testified that she was trained to operate the device by her supervisor, who was trained by the device's manufacturer, Thermo Scientific, using the procedures described in the manufacturer's manual. Schiefelbein explained that she used the FTIR spectroscope daily in accordance with procedures that were accredited annually. Further, maintenance and

---

[9] While the record supporting Schiefelbein's qualification for the UV spectrometer is the weakest of the three devices, on this record, the circuit court did not clearly abuse its discretion in accepting her qualification. See Larsen, 64 Haw. at 304, 640 P.2d at 288. Further, the dispositive tests as to weight – the Sartorius MCE electronic balance – and identity – the Thermo Scientific FTIR spectroscope – of the substance were sufficient to support Schiefelbein's qualification and the admission of the scientific test results.

calibration of the device was performed by a manufacturer's vendor.

Based on this record, we conclude the State established a proper foundation for the admission of the weight and identity of the recovered substance tested by Schiefelbein on the Sartorius electronic balance, the Agilent UV spectrometer, and the Thermo Scientific FTIR spectroscope because the State established by a preponderance of the evidence "(1) the qualifications of the expert; (2) whether the expert employed 'valid techniques' to obtain the test result; and (3) whether 'the measuring instrument[s were] in proper working order.'"  See Long, 98 Hawai'i at 355, 48 P.3d at 602.

### 2.  **Alternate basis for lack of foundation**

As an alternate basis for sustaining the ICA's vacatur of Spies's conviction, Spies argues that the State's foundation for its laboratory testing of the methamphetamine was insufficient because the evidence for the laboratory accreditation and device calibration was dated after the laboratory tests were performed.

We have "affirm[ed] that a 'lack of foundation' objection generally is insufficient to preserve foundational issues for appeal because such an objection does not advise the trial court of the problems with the foundation."  Long, 98

Hawai'i at 353, 48 P.3d at 600. Instead, a specific objection is required to inform the court of the error unless, "based on the context, it is evident what the general objection was meant to convey." Id.

At trial, all of Spies's relevant objections were made pursuant to Motion in Limine 1. For example, when Spies objected to the admission of the interpretation of the lab analysis as to the identity and weight of the methamphetamine seized from his pickup truck during Schiefelbein's testimony, Spies only "object[ed] as to foundation in accordance to Motion in Limine 1."[10]

Similarly, during HPD criminalist Roush's testimony, Spies objected to the admission of four exhibits into evidence: 1) exhibit 34, ANAB's certificate of accreditation; 2) exhibit 35, the ANAB "scope of accreditation" documentation;[11] 3) exhibit 43, the Mettler Toledo electronic balance's accuracy calibration certificate **[Id. at 119]**; and 4) exhibit 50, the preventative

---

[10]    Spies objected separately to the admission of Schiefelbein's interpretation of the test results as to the presence of methamphetamine and as to its total net weight. Both objections were made pursuant to Motion in Limine 1.

[11]    The ANAB "scope of accreditation" entered into evidence describes the disciplines in which the HPD Crime Lab was accredited. As is relevant here, the HPD Crime Lab was accredited to perform the following analyses in "seized drugs": qualitative determinations of botanical, liquid, and solid items using, inter alia, infrared spectroscopy and ultraviolet spectroscopy; volume measurements of liquid using volumetric glassware; and weight measurements of botanical and solid items using a balance.

maintenance verification for the FTIR device.  In each instance, the circuit court admitted the evidence over Spies's objections, which were made pursuant to Motion in Limine 1.

Spies set forth four bases for his "object[ions] to the introduction of any laboratory results absent a sufficient showing of foundation" in his Motion in Limine 1:

> (1) sufficient foundation regarding the training of the laboratory technician/expert; (2) sufficient foundation regarding the equipment utilized for the testing; (3) sufficient foundation regarding the laboratory technician/expert with respect to the equipment utilized. Defendant also requests (4) that no evidence regarding training or laboratory results be admitted into evidence in violation of Defendant's right to confront the testimony against him.

Of these four objections, only the second objection regarding "the equipment utilized for the testing" could be reasonably construed as potentially raising the issue of the laboratory accreditation and device calibration dates.  However, at no point at trial or in Motion in Limine 1 did Spies assert that the laboratory accreditation and device calibration were postdated as a basis for his objection.

On this record, no relevant objection was made regarding the date of the laboratory accreditation and device calibration.  See Long, 98 Hawai'i at 353, 48 P.3d at 600.  Therefore, because Spies raised no specific objections regarding the date of the laboratory accreditation and device calibration in his Motion in Limine 1 or at trial, the issue is waived on

appeal.[12]  See id.; Kobashigawa v. Silva, 129 Hawai'i 313, 322, 300 P.3d 579, 588 (2013).

**B.    Detention Following the Execution of a Valid Search Warrant**

We now consider Spies's alleged errors to determine whether they support vacating the ICA on other grounds.  As discussed below, we determine they do not.

Spies challenges the admission of his incriminating statements and any evidence recovered thereby on two bases: the lawfulness of the detention and the voluntariness of the statements in the absence of a Miranda warning.  We first address the lawfulness of Spies's detention because if Spies's incriminating statements were made while he was unlawfully detained, his statement and any evidence obtained through it would be inadmissible against him, warranting reversal.  See State v. Davenport, 55 Haw. 90, 92, 516 P.2d 65, 67-68 (1973) ("We start from the proposition that evidence obtained by means of an unconstitutional search and seizure is inadmissible in a criminal prosecution, and that a conviction obtained thereby must be reversed.") (citing Mapp v. Ohio, 367 U.S. 643 (1961)).

---

[12]    Even had Spies's objections been properly preserved, the circuit court's determination could have been supported on an alternate basis because post-hoc results still support an inference that the device was operating correctly at the time the device was used.  Thus, the mere fact that a certification or accreditation is post-dated does not by itself necessitate reversal when nothing in the record supports a finding that the device was not in proper working order when the test was performed.

Spies argues that under State v. Alvarez, 138 Hawai'i 173, 378 P.3d 889 (2016), his detention was unlawfully prolonged because the justification to detain him ended once the execution of the search warrant returned no illegal activity. Therefore, Spies argues that because he was not released or informed that he was free to go, any evidence recovered as a result of that detention, including his various incriminating statements, were subject to exclusion.

We summarized the following principles in Alvarez:

> Whether a seizure pursuant to an investigative stop is reasonable depends on the application of a two-part inquiry that was first articulated by the U.S. Supreme Court in Terry v. Ohio, 392 U.S. 1, 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967), and later adopted by this court in State v. Perez, 111 Hawai'i [392,] 397, 141 P.3d [1039,] 1044[ (2006)]. If the police action fails to satisfy both parts of the Perez test, the evidence originating from that unlawful action must be suppressed. See [State v.] Estabillio, 121 Hawai'i [261,] 273, 218 P.3d [749,] 762[ (2009)].

> As to the first part of the Perez test, the court must determine "whether the action was justified at its inception." Id. "To justify an investigative stop, . . . the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." State v. Barnes, 58 Haw. 333, 338, 568 P.2d 1207, 1211 (1977) (internal quotations and citations omitted).

> . . . .

> It is the second part of the Perez test that is at issue here. Under that part, the court must determine "whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." [Perez, 111 Hawai'i at 397, 141 P.3d at 1044] (citation and internal quotation marks omitted). This scope may be exceeded in either of two ways. First, any "temporary investigative detention" such as a traffic stop must be "truly temporary," i.e., it

> must "last no longer than is necessary to effectuate the purpose of the detention." Estabillio, 121 Hawaiʻi at 270, 218 P.3d at 758. Second, the subject matter and intensity of the investigative detention must be limited to that which is justified by the initial stop. See id. at 271-72, 218 P.3d at 759-60 (initiation of an unrelated drug investigation when defendant was pulled over for a traffic infraction violated defendant's constitutional rights); see also State v. Goudy, 52 Haw. 497, 502, 479 P.2d 800, 804 (1971); Kaleohano, 99 Hawaiʻi at 378-79, 56 P.3d at 146-47; State v. Kaluna, 55 Haw. 361, 369, 520 P.2d 51, 58-59 (1974).

Id. at 182, 378 P.3d at 898.

Here, Spies challenges his detention under the second part of the Perez test, contending his prolonged detention violated his rights and resulted in the warrantless search of his vehicle and arrest. Spies argues that after the execution of the search warrant of his person, he should have been permitted to leave. Spies emphasizes that law enforcement did not have probable cause to arrest him until he stated, "Everything that you guys are looking for is in there." Absent that statement, which Spies argues was made during a prolonged detention without Miranda warnings, there would be no probable cause to continue to detain Spies.

Article I, section 7 of the Hawaiʻi Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

35

"The overriding function of [the search and seizure clause] is to protect personal privacy and dignity against unwarranted intrusion by the State.  The values they protect overlap those protected by the self-incrimination clauses of the federal and state constitutions."  State v. Wyatt, 67 Haw. 293, 303, 687 P.2d 544, 551-52 (1984) (internal citations and quotation marks omitted) (quoting then citing Schmerber v. California, 384 U.S. 757, 767 (1966)).

Spies's incriminating statement was made approximately three minutes after the execution of the search warrant on his person was complete.

Because Spies had been initially detained subject to a valid search warrant for his person, his detention during the execution of the warrant was presumptively constitutional.[13]  See Davenport, 55 Haw. at 92-93, 516 P.2d at 68 ("If those facts [presented to a neutral magistrate], viewed exclusively and in their totality, are substantial enough to engender the amorphous state of mind known as 'probable cause,' then the warrant, and

---

[13]    While Spies challenges the validity of the probable cause supporting the search warrant for his person, that argument is without merit because the affidavit submitted in support of the warrant application presented sufficient "facts and circumstances within [the affiant]'s knowledge . . . to warrant a person of reasonable caution to believe that an offense has been committed" as well as sufficient "'underlying circumstances' from which the police concluded that the objects sought to be recovered were where they claimed they were."  See Detroy, 102 Hawai'i at 18, 72 P.3d at 490; State v. Sepa, 72 Haw. 141, 144, 808 P.2d 848, 850 (1991).

hence the search, are at least prima facie constitutional.").

As one commentator explained,

> In the execution of a search warrant directed at a person, it may well be that "the brief restraint on freedom of movement entailed in" such execution can be said to constitute a . . . seizure, but this does not mean it requires "independent justification, for it is a seizure that is incidental to the search authorized by the search warrant." "Stated differently, a warrant to search a person for evidence of a crime 'implicitly carries with it the limited authority' to seized [sic] and detain the person while the search is conducted."

2 Wayne R. LaFave, Search and Seizure § 4.9(a) (6th ed. 2024) (footnotes omitted) (quoting In re G.B., 139 A.3d 885, 894-95 (D.C. App. 2016) (quoting Michigan v. Summers, 452 U.S. 692, 696 (1981))).

However, "[o]nce a search warrant has been fully executed and the fruits of the search secured, the authority under the warrant expires and further governmental intrusion must cease." State v. Chaisson, 486 A.2d 297, 303 (N.H. 1984) (quoting United States v. Gagnon, 635 F.2d 766, 769 (10th Cir. 1980), cert. denied, 451 U.S. 1018 (1981)) (holding police could not remain in home after execution of search warrant to arrest resident upon return). Any unwarranted detention thereafter would be unlawful.

If Spies's incriminating statement was made while he was unlawfully detained, his statement and any evidence obtained thereby would be inadmissible, and his conviction thereupon must be reversed. See Davenport, 55 Haw. at 92, 516 P.2d at 67-68.

37

Once the initial investigatory purpose has expired, "[subsequent] investigation must be supported by independent reasonable suspicion to be constitutional." Estabillio, 121 Hawai'i at 273, 218 P.3d at 761 (citing State v. Bolosan, 78 Hawai'i 86, 92, 890 P.2d 673, 679 (1995)); Ohio v. Robinette, 519 U.S. at 50 (Stevens, J. dissenting) (explaining that absent "further justification for detention," continued detention after a lawful detention had ended "was therefore only justifiable, if at all, on some other grounds"). In the context of warrantless seizures, this court has recognized three exceptions to article I, section 7 of the Hawai'i Constitution's warrant requirement:

> [T]he police may arrest an individual if they have probable cause to believe that the individual is committing or has committed an offense; the police may temporarily detain an individual if they have a reasonable suspicion based on specific and articulable facts that criminal activity is afoot; and the police may engage in an investigative encounter with an individual if the individual "consents."

State v. Kearns, 75 Haw. 558, 569, 867 P.2d 903, 908 (1994) (citations omitted).

As we explained in our "walk and talk" cases, absent reasonable suspicion or the development of probable cause to justify further detention, a police officer must obtain consent to continue detention for questioning. State v. Quino, 74 Haw. 161, 173-75 , 840 P.2d 358, 364-65 (1992); Kearns, 75 Haw. at 571, 867 P.2d at 909; State v. Trainor, 83 Hawai'i 250, 260, 925 P.2d 818, 828 (1996). In Kearns, we announced the rule that:

> an investigative encounter can only be deemed "consensual"
> if (1) prior to the start of questioning, the person
> encountered was informed that he or she had the right to
> decline to participate in the encounter and could leave at
> any time, and (2) the person thereafter voluntarily
> participated in the encounter.

75 Haw. at 571, 867 P.2d at 909 (quoted in Trainor, 83 Hawai'i at 260, 925 P.2d at 828).

The "walk and talk" cases involved investigative encounters during which police officers would approach passengers arriving by airplane in Hawai'i and question them about possible drug trafficking. Officers would "conceal[] their investigative objective" in order to obtain consent. Quino, 74 Haw. at 175, 840 P.2d at 364. Then, "[u]tilizing questions that gradually became more intrusive, the officers sought to bootstrap their investigation into discovery of possible criminal activity." Id. at 172, 840 P.2d at 363. The result was that once questioning began, however, "the circumstances beget an obligation by the citizen to reply to any and all questions, no matter how intrusive, lest the authorities deem one's conduct suspicious." Id. To prevent these abusive police practices, this court adopted a rule requiring an officer to inform the suspect that they were free to leave prior to obtaining consent. E.g., Kearns, 75 Haw. at 571, 867 P.2d at 909. In this context, we distinguished consent to search from consent to seizure:

> The police are not required to inform the person to be searched of his or her right to refuse consent, but their failure to so inform is a factor to be considered in determining whether consent to a search was freely and voluntarily given. Nakamoto v. Fasi, 64 Haw. 17, 21, 635 P.2d 946, 951 (1981). Although this rule is appropriate in the context of searches where the scope of the search is generally well-defined and limited to a particular item or area at the time consent is given, it is not equally applicable to seizures. The rule is particularly inappropriate in the context of the "walk and talk" program where the seizure is an ongoing interrogation of increasing intrusiveness whose scope is not revealed to the individual at the outset.

Id. at 570, 867 P.2d at 909 (emphasis added).

Because of the risk of ever-expanding scope, we held that "there can be no 'consent' to a 'seizure' once the seizure has occurred in the constitutional sense, that is, after the seizure has already been effected." Trainor, 83 Hawai'i at 260, 925 P.2d at 828 (quoting Kearns, 75 Haw. at 573-74, 867 P.2d at 910 (Levinson, J., concurring)) (emphasis in original) (citations omitted).

Here, because Spies's detention was pursuant to the execution of a search warrant for his person, the risk of abuse in the context of a "walk and talk" is not present. In that regard, the execution of a search warrant is similar to a traffic stop, which "must be limited to that which is justified by the initial stop." See Alvarez, 138 Hawai'i at 182, 378 P.3d at 898. Thus, because we believe it more apt in this context, we adopt the rule announced by the Ohio Supreme Court in State v. Robinette:

40

> [T]he right . . . to be secure in one's person and property requires that citizens stopped for traffic offenses be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation. Any attempt at consensual interrogation must be preceded by the phrase "At this time you are free to go," or by words of similar import.

653 N.E.2d at 696.

We find persuasive the Ohio Supreme Court's reasoning that the absence of such a notice can result in abusive police practices:

> The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.

Id. at 698.

Here, Spies was not informed that he was free to go, nor did he consent to further investigation. Therefore, the dispositive question is whether, following the execution of the search warrant that yielded no incriminating evidence, Spies was permissibly detained for a Terry-type, investigative stop. See State v. Robinette, 685 N.E.2d 762, 767 (Ohio 1997) (requiring "articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention"); Estabillio, 121 Hawaiʻi at 273, 218 P.3d at 761 ("[Subsequent] investigation must be supported by independent reasonable suspicion to be constitutional.") (citation omitted). We conclude that he was.

41

As this court has explained, "the police may temporarily detain an individual if they have a reasonable suspicion based on specific and articulable facts that criminal activity is afoot." E.g., Kearns, 75 Haw. at 569, 867 P.2d at 908 (citing State v. Melear, 63 Haw. 488, 493, 630 P.2d 619, 624 (1981)). In determining whether an officer had reasonable suspicion,

> [reviewing courts] must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might elude an untrained person." Although an officer's reliance on a mere "'hunch'" is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level of probable cause[.]

Spillner, 116 Hawai'i at 358, 173 P.3d at 505 (citations omitted) (emphasis added) (quoting United States v. Arvizu, 534 U.S. 266, 273-74 (2002)).

In Spillner, we upheld the defendant's conviction for driving without a license and without insurance. 116 Hawai'i at 353, 173 P.3d at 500. The arresting officer had twice stopped the defendant in the preceding weeks for driving without a license, without insurance, and with an illegally tinted windshield. Id. When the defendant was stopped the third time, he had removed the illegal tint, but still lacked a license and insurance. Id.

42

The defendant argued that the arresting officer could not have had reasonable suspicion at the time the defendant was stopped that he had not gotten a license and insurance.  Id. at 357, 173 P.3d at 504.  The defendant further argued that the officer could not rely on his knowledge from his prior interactions with him in establishing reasonable suspicion to make the stop.  Id.

The Spillner court disagreed.  Id. at 358, 173 P.3d at 505.  Instead, we distinguished:

> (1) an officer's improper reliance, in forming reasonable suspicion, on a defendant's past law violations that have come to an end from (2) an officer's reliance on knowledge of a suspected ongoing law violation engaged in by the individual in question; the former, if relied upon alone to justify the stop, represents a violation of a citizen's reasonable expectation to be left alone and our society's abhorrence of police practices that "'round up the usual suspects,'" while the latter, if properly informed by the facts, represents good police work.

Id. at 360, 173 P.3d at 507 (internal citations omitted) (quoting United States v. Laughrin, 438 P.3d 1245, 1247 (10th Cir. 2006)).

As this court explained:

> [a]lthough we have already emphasized that a person's prior history of drug arrests is insufficient to establish probable cause, awareness of past arrests may, when combined with other specific articulable facts indicating the probability of current criminal activity, factor into a determination that reasonable suspicion, sufficient to warrant a temporary investigate stop, exists.

Id. (quoting Kaleohano, 99 Hawai'i at 380, 56 P.3d at 148).

Here, the execution of the search warrant for Spies's person turned up no incriminating evidence; therefore, Spies contends there could be no reasonable suspicion to justify his further detention. We disagree. See id.; Estabillio, 121 Hawai'i at 273, 218 P.3d at 761.

Officer Gaspar testified that he knew from his prior investigation of Spies that Spies sold a confidential informant heroin in a controlled purchase. Further, Officer Gaspar knew that drug dealers tend to keep drugs in close proximity to them. Officer Gaspar also averred in his affidavit in support of his warrant application that he knew from his training and experience that drug dealers "commonly conceal or transport illegal narcotics and its related paraphernalia in vehicles, fanny packs, or other bags which they keep near them." More specifically, Officer Gaspar averred that he "corroborate[d] through several reliable confidential informants and also Vice Officers that SPIES commonly carries and distributes narcotics from this pickup truck."

Based on his knowledge and experience, the fact that the warrant search returned no incriminating evidence, and the fact that Spies had no bags or other belongings on him at the time of the search, Officer Gaspar testified that he believed the drugs were in the vehicle.

Thus, under the totality of the circumstances, Officer Gaspar had a "particularized and objective basis" to support his reasonable suspicion that evidence of ongoing criminal conduct was present in Spies's vehicle.  Spillner, 116 Hawaiʻi at 358, 173 P.3d at 505.  "In sum, articulated facts that indicate that an offense is ongoing in nature support reasonable suspicion that criminal activity continues to be afoot and, therefore, help justify a brief investigatory stop to confirm or dispel those suspicions."  Id. at 360, 173 P.3d at 507.  Therefore, we conclude that Spies's detention following the execution of the search warrant on his person up to Spies's spontaneous statement was permissible because it was supported by Officer Gaspar's reasonable suspicion of ongoing criminal conduct.  See id. at 358, 173 P.3d at 505.

Further, once Spies made his spontaneous, incriminating statement that "It[']s all in there," probable cause existed such that his detention and arrest were reasonable for purposes of article I, section 7 of the Hawaiʻi Constitution. See State v. Yong Shik Won, 137 Hawaiʻi 330, 347, 372 P.3d 1065, 1082 (2015), as corrected (Dec. 9, 2015).  In light of the facts as known by Officer Gaspar at that time, a reasonable person could conclude that Spies admitted to having illegal narcotics in his vehicle.  See Detroy, 102 Hawaiʻi at 18, 72 P.3d at 490.

45

Officer Gaspar knew that Spies had illegal narcotics in his possession within the preceding 48 hours through a confidential informant and that Spies sold heroin to a confidential informant during a controlled buy within the preceding 10 days.  Office Gaspar knew that Spies had just exited his vehicle and that he had nothing on him at the time the search warrant was executed.  Officer Gaspar also knew that he had discussed the search warrant for illegal narcotics with Spies just prior to asking for consent to search the pickup truck.  In this context, a reasonable person could conclude that the "it" in Spies's statement referred to illegal narcotics.

That Officer Gaspar did not believe that there was probable cause to arrest at that point or that he did not fully understand the import or meaning of Spies's statement is not dispositive.  We have rejected challenges to warrantless searches leading to arrest based on the arresting officer's disavowal of probable cause.  E.g., State v. Delmondo, 54 Haw. 552, 512 P.2d 551 (1973).  Instead, we have explained,

> However, the officer's statements on this issue are not totally dispositive of the matter. 'Probable cause' is determined not by a subjective standard (i.e., not by the officer's personal opinions) but by a 'reasonable man' (or objective) standard. The use of an objective standard has been black letter law since at least Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and has been adopted by this court.  State v. Texeira, 50 Haw. 138, 433 P.2d 593 (1967).

Delmondo, 54 Haw. at 553-54, 512 P.2d at 552.

Because Spies's detention following the execution of the search warrant was supported first by reasonable suspicion and then by probable cause, consent for the detention was not required and the Robinette rule has no application here. Therefore, based on the foregoing, we conclude that the ICA did not err in affirming the circuit court's determination that Spies's detention following the execution of the search warrant was not violative of Spies's rights.

## C. Admissibility of Incriminating Statements Absent a Miranda Warning

We now turn to whether the ICA erred in affirming the circuit court's determination that Spies's various incriminating statements were voluntary. Because there is no dispute that Spies was in custody when he made those statements, Spies argues that the ICA "adopted a categorial exception" that "a request for consent to search the vehicle, without more, is not interrogation." This exception, Spies argues, is contrary to the fact-specific inquiry required to determine when a police officer's actions rise to the level of interrogation. (Citing State v. Pa'ahana, 66 Haw. 499, 503, 666 P.2d 592, 596 (1983); State v. Hoffman, 155 Hawai'i 166, 169, 557 P.3d 895, 898 (2024) ("[T]he ultimate inquiry is whether a law enforcement officer knew or should have known that their words or conduct were

47

reasonably likely to elicit an incriminating response from the defendant[.]")).

Spies contends that here, Officer Gaspar's request for consent to search the pickup truck was likely to elicit an incriminating response because Spies continued to be detained after nothing illegal was found on his person.[14]  Spies further argues that "[w]hile there was not a layer of heavy interrogation immediately prior" to his statement, Spies had just been subjected to a search of his person.  Thus, Spies reasons, "to carve out a categorical exception" as the ICA did under these circumstances was error.

While Spies contends that the circuit court erred in granting the State's motion to determine voluntariness, we construe Spies's challenge to be primarily based on Officer Gaspar's failure to give him a Miranda warning, rather than a challenge to the voluntariness of his statements.  As noted below, Spies's argument before this court is limited to whether that determination was based on an improper "categorical exception to the Miranda requirement."[15]

---

[14]    Within the meaning of Miranda, an "incriminating response" is "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial."  Rhode Island v. Innis, 446 U.S. 291, 301 n.5 (1980).

[15]    Within the context of our system of state constitutional protections, the Miranda rule is a rule of evidence, prescribed by article I, section 10 of our Constitution, that requires a sufficient foundation before

(continued . . .)

We turn now to the merits of Spies's challenge under

Miranda.  As this court has explained,

> Under the Hawaiʻi Constitution, "[a]bsent Miranda
> warnings and a valid waiver of them, statements obtained
> from a person subjected to uncounseled custodial
> interrogation are inadmissible in a subsequent criminal
> proceeding brought against that person."  State v. Ah Loo,
> 94 Hawaiʻi 207, 210, 10 P.3d 728, 731 (2000).  A "custodial
> interrogation" consists of
>
>> questioning initiated by law enforcement officers
>> after a person has been taken into custody or
>> otherwise deprived of their freedom of action in any
>> significant way.  In other words, the defendant,
>> objecting to the admissibility of their statement
>> and, thus, seeking to suppress it, must establish
>> that their statement was the result of (1)
>> "interrogation" that occurred while they were (2) "in
>> custody."

---

(. . . continued)

the prosecution "may adduce evidence of a defendant's custodial statements
that stem from interrogation during his or her criminal trial."  State v.
Eli, 126 Hawaiʻi 510, 520, 273 P.3d 1196, 1206 (2012) (quoting State v.
Ketchum, 97 Hawaiʻi 107, 117, 34 P.3d 1006, 1016 (2001), as amended (Nov. 20,
2001)).  We explained the difference between the Miranda inquiry and the
voluntariness inquiry in Eli:

> It must be emphasized that the Miranda requirement, based
> on article 1, section 10 of the Hawaiʻi Constitution,
> requires warnings to be given prior to questioning in a
> custodial setting, while constitutional due process, based
> on article 1, section 5 of the Hawaiʻi Constitution,
> requires a statement to be "voluntary" in order to be
> admissible.  "Put differently, if a defendant's Miranda
> rights against self-incrimination have been violated, then
> any resulting statement will be inadmissible at trial as a
> per se matter, obviating the need for any [voluntary] due
> process inquiry into whether the defendant's confession has
> been coerced[.]"  "Correlatively, having been properly
> Mirandized, if a defendant who is subjected to custodial
> interrogation makes a statement, then, depending on the
> circumstances, an inquiry into whether the defendant's
> right to due process of law has been violated via coercion,
> may be warranted."

Eli, 126 Hawaiʻi at 520 n.17, 273 P.3d at 1206 n.17 (citations omitted)
(brackets in original) (quoted in State v. Kazanas, 138 Hawaiʻi 23, 41
n.7, 375 P.3d 1261, 1279 n.7 (2016)).

> [State v. ]Hewitt, 153 Hawai'i [33,] 43, 526 P.3d [558,] 568 [(2023)] (cleaned up).

Hoffman, 155 Hawai'i at 172, 557 P.3d at 901.

"[I]nterrogation under Miranda refers to (1) any words, actions, or practice on the part of the police, not only express questioning, (2) other than those normally attendant to arrest and custody, and (3) that the police should know is reasonably likely to invoke an incriminating response." Id. at 175, 557 P.3d at 904. As we recently explained, the second factor, namely whether the statement was normally attendant to arrest or custody, is still subject to analysis under the third factor. Id. ("[A]n unbroken chain of Hawai'i appellate precedent holds that, under the Hawai'i Constitution, police questions 'normally attendant to arrest and custody' are still subject to the touchstone inquiry into whether those questions were reasonably likely to elicit an incriminating response."). Thus, the ultimate inquiry is whether the police officer should have known that their words, actions, or practices were reasonably likely to invoke an incriminating response. Id.

Spies made two unwarned statements prior to his arrest. First, in response to Officer Gaspar's request for consent to search his pickup truck, Spies's said either "It[']s all in there" or "Everything that you guys are looking for is in there." Then, in response to Office Gaspar's follow-up

50

question, "What?," Spies stated that "It's in the black wallet." The following day, Spies made additional incriminating statements during a police station interview after Spies had been advised of his rights under Miranda, waived his right to any attorney, and consented to the interview.

The State's motion to determine voluntariness did not distinguish between these multiple statements. Instead, the State moved for a determination "that statements made by the Defendant were in fact voluntarily made." The circuit court granted the State's motion in whole as to all of Spies's statements, both before and after being informed of his Miranda rights. We review the circuit court's conclusions of law as to the admissibility of each grouping of statements in turn: (1) Spies's statement in response to Officer Gaspar's question for consent to search Spies's pickup truck; (2) Spies's statement following Officer Gaspar's subsequent question; and (3) Spies's statements during his police station interview.

**1.    Request for consent to search vehicle**

Spies's first incriminating statement, that "It[']s all in there" or "Everything that you guys are looking for is in there," was made in response to a request for consent to search

Spies's pickup truck.[16]  Officer Gaspar testified at the
voluntariness hearing that after the execution of the search
warrant on Spies's person returned no illegal substances, he and
Spies engaged in "a conversation," and that "in speaking with
[Spies]," Officer Gaspar "tr[ied] to develop a rapport with
him."  It appears that during this conversation, Spies inquired
about the warrant, and Officer Gaspar repeatedly stated, without
further elaborating, that he "had a search warrant . . . that
was signed by a judge."  It is unclear from the record what
statements Officer Gaspar made during this conversation when
"trying to develop a rapport" with Spies.  However, Spies
concedes "there was not a layer of heavy interrogation

---

[16]  Despite the alleged constitutional violation arising from a
request for consent to search, this is not a consent to search case.  Quite
simply, consent to search Spies's vehicle was never obtained.  Instead,
Spies's pickup truck was seized and impounded at the South Kohala Police
Station based on probable cause arising from Spies's incriminating statement
in response to the request to search.  Ultimately, the pickup truck was
searched pursuant to a valid search warrant issued after the drug detector
dog alerted to the presence of drugs in the airspace around the impounded
vehicle.  See State v. Groves, 65 Haw. 104, 112, 649 P.2d 366, 372 (1982)
("There can be no reasonable expectation of privacy in the airspace
surrounding a person's luggage.").

    As discussed above, this case is also not a consent to seizure
situation because Spies's continued detention following the execution of the
search warrant was supported by reasonable suspicion.  See Spillner, 116
Hawaiʻi at 358, 173 P.3d at 505; Detroy, 102 Hawaiʻi at 18, 72 P.3d at 490.

    Therefore, we are not called to determine whether "the
defendant's purported relinquishment of a right to be free of unreasonable
searches and seizures" was freely and voluntarily given.  Yong Shik Won, 137
Hawaiʻi at 340, 372 P.3d at 1075.  Instead, our inquiry is limited to whether
Officer Gaspar's request for consent to search was reasonably likely to
elicit an incriminating response.  See Hoffman, 155 Hawaiʻi at 175, 557 P.3d
at 904.

immediately prior."  After showing Spies the search warrant, Officer Gaspar asked Spies for consent to search his pickup truck.  In response to the request for consent to search, Spies stated "It[']s all in there" or "Everything that you guys are looking for is in there."[17]  The circuit court found this statement was "not responsive to the request for consent."

The body camera footage admitted as evidence shows that at the time Officer Gaspar requested consent to search, Spies was standing beside the bed of his pickup truck flanked by two plain-clothed police officers.  Two other uniformed police officers were standing nearby.  Spies had just been detained and searched in the Waimea Foodland parking lot, a highly public location with heavy foot traffic.  A police vehicle was parked behind the pickup truck, blocking it in its parking spot.

It is undisputed that Spies was in custody at the time Officer Gaspar requested consent to search Spies's pickup truck.  Therefore, whether Spies's incriminating statement was properly admitted at trial turns exclusively on whether Officer Gaspar's request for consent to search was interrogation for purposes of Miranda.  See Hoffman, 155 Hawaiʻi at 175, 557 P.3d at 904.  We conclude, based on the totality of the circumstances, that it

---

[17]  As explained supra, the circuit court found that Spies said "It[']s all in there," whereas Officer Gaspar's testimony at trial was that Spies said, "Everything that you guys are looking for is in there."

was not.  Because the request for consent to search sought a yes or no response rather than an open-ended request for information, and thus was not conduct that was reasonably likely to elicit incriminating information, the request for consent to search, without more, did not violate article I, section 10 of the Hawai'i Constitution.

Although this question is an issue of first impression before this court, the ICA addressed this precise issue in State v. Rippe, where it held that "a request for consent to search is not a request for information, and, therefore, is not reasonably likely to elicit an incriminating response," and thus is not interrogation for purposes of Miranda.  119 Hawai'i 15, 22-23, 193 P.3d 1215, 1222-23 (App. 2008) ("The vast majority of courts that have considered the issue, including this court, has concluded that a request for consent to search does not constitute interrogation.");[18] State v. McKnight, 131 Hawai'i 379, 393 n.16, 319 P.3d 298, 312 n.16 (2013) (approving the holding in Rippe that the officer's request for consent to search a nylon bag under driver's seat of vehicle was not interrogation); see also Kaleohano, 99 Hawai'i 370, 56 P.3d 138 (remanding where

_____

[18]     The analysis set forth in in Rippe and followed here remains the majority approach in jurisdictions that have addressed this issue.  See 4 Wayne R. LaFave, Search and Seizure § 8.2(j) (6th ed. 2024).

defendant gave oral consent to search following a valid traffic stop but circuit court made no specific findings addressing voluntariness).

In Rippe, the police detained the defendant on suspicion that his vehicle was stolen. 119 Hawai'i at 18, 193 P.3d at 1218. After arresting him, the police searched the vehicle and found a nylon bag. Id. When the police asked for consent to search the bag, the defendant denied that the bag belonged to him. Id. at 19, 193 P.3d at 1219. The police then asked if the vehicle belonged to the defendant and the defendant responded in the affirmative. Id. The police explained that the bag had been found in the vehicle and the defendant "responded that people put things in his car all the time." Id. Believing that the defendant disclaimed owning and had thus abandoned the bag, the police searched it, finding two packets of methamphetamine. Id. The police then arrested the defendant on drug charges. Id. The defendant did not receive a Miranda warning until the following day. Id.

The Rippe defendant sought, and the circuit court agreed, to suppress the evidence and statements. Id. The ICA reversed in part, concluding that the initial request for consent to search the nylon bag was not interrogation and thus the response disclaiming ownership was not subject to exclusion.

Id. at 24, 193 P.3d at 1224.  However, the ICA further concluded that the police's subsequent questions were interrogation and therefore the responses were correctly suppressed.  Id.  The Rippe court reasoned that the officer's request for consent to search differed from his subsequent questions about ownership of the vehicle and the bag because the request for consent, by itself, was not reasonably likely to elicit an incriminating response, whereas the follow-up questions were.  Id. at 23-24, 193 P.3d at 1223-24.

The ICA distinguished the facts in Rippe from those in State v. Blackshire, 10 Haw. App. 123, 861 P.2d 736 (App. 1993), overruled on other grounds by Ah Loo, 94 Hawai'i 207, 10 P.3d 728, where the ICA held that evidence recovered following a request for consent to search a bag was subject to exclusion because, although the request itself was not interrogation, the request for consent occurred during a series of other questions that amounted to custodial interrogation.  Rippe, 119 Hawai'i at 22-23, 193 P.3d at 1222-23 (citing Blackshire, 10 Haw. App. at 137, 861 P.2d at 743 (citing United States v. Lemon, 550 F.2d 467, 472 (9th Cir. 1977))).  Prior to requesting consent to search the Blackshire defendant's bag, the police officer asked the defendant his name, to see his identification, his residence, his phone number, where he was staying, and if he was

carrying narcotics.  Blackshire, 10 Haw. App. at 129, 861 P.2d at 740.

Rippe is consistent with our caselaw in other contexts where this court has addressed whether a defendant was subject to custodial interrogation, particularly where the questions involved were yes-or-no questions that were not reasonably likely to elicit an incriminating response.  Rippe, 119 Hawai'i at 23-24, 193 P.3d at 1223-24 (citing State v. Naititi, 104 Hawai'i 224, 237, 87 P.3d 893, 906 (2004) (concluding that inquiring whether defendant wished to make a statement or be afforded an attorney was not interrogation)).  Specifically, as the ICA reasoned in Rippe, requesting consent to search "required a simple 'yes-or-no' answer, [which] was not the type of question reasonably likely to elicit an incriminating response."  Id. at 24, 193 P.3d at 1224.

Here, nothing in the record suggests that Officer Gaspar's request for consent to search was part of a larger pattern of conduct that would have amounted to custodial interrogation.  Thus, the facts here are distinguishable from Blackshire, where the ICA concluded the request for consent to search amounted to interrogation because it was preceded by a line of questioning.  There, the ICA declined to take the request for consent to search out of its context.  We do so too;

however, nothing about the broader context here, from the execution of the search warrant to showing Spies the search warrant at Spies's own instigation evinces a pattern of conduct that was "reasonably likely to elicit an incriminating response" and thus amounted to interrogation.[19]  See Hoffman, 155 Hawai'i at 175, 557 P.3d at 904.

Based on the record before us, we hold that Officer Gaspar's request for consent to search Spies's pickup truck was not interrogation for purposes of article I, section 10 of the Hawai'i Constitution.  We therefore conclude that the ICA did not err in affirming the circuit court's determination that Spies's statement, "It[']s all in there," in response to the request for consent to search was admissible at trial despite the absence of a prior Miranda warning.

---

[19]   In State v. Trinque, we held that where an officer "ingratiated himself to [the defendant] and implied that he was someone who might be able to provide some form of assistance," the officer's advisory "to not make any more statements until [the defendant] was taken to the police station" was likely to elicit an incriminating response.  140 Hawai'i 269, 279, 400 P.3d 470, 480 (2017).  The Trinque officer's "ingratiating" statements included telling the defendant that "he would not lie to him," that he would not "jerk his chain," and that he personally knew the defendant's daughter.  Id. at 273, 400 P.3d at 474.  Here, while the exact statements Officer Gaspar made to Spies prior to searching his person and requesting consent to search his vehicle are unclear, Gaspar's testimony that he only answered Spies' questions does not seem to rise to the same "ingratiating" level as the officer's statements in Trinque.

2.    **Subsequent questioning**

We now turn to Spies's response to Officer Gaspar's follow-up question, "What?"  As noted above, Spies responded, "It's in the black wallet" and referred to the truck's center console.

The circuit court concluded that "[Spies]'s statements in response [to the request for consent to search his vehicle] warranted a brief follow-up as the statement was initial [sic] vague and unresponsive. . . .  Not fully understanding the response, Officer Gaspar asked to clarify at which point Defendant stated it is all in the wallet in the center console."  Therefore, the circuit court concluded that because "[t]he officer's questions and actions prior to defendant's statements were not the kind of coercive conduct which would undermine defendant's privilege against self-incrimination," they were voluntary and not subject to exclusion.

The circuit court relied on this court's opinion in Kaleohano, where we held that "brief questioning aimed at confirming or dispelling [an officer's] remaining suspicion was justified in light of its reasonableness."  99 Hawai'i at 380, 56 P.3d at 148.  However, Kaleohano, which involved a traffic stop for suspicion that the defendant was driving while intoxicated, is inapt because the defendant was not yet in custody because

probable cause had not yet developed.  Id. at 378, 56 P.3d at 146.

In Kaleohano, an officer stopped the defendant after witnessing the defendant's vehicle "swerve within its lane" twice.  Id. at 372, 56 P.3d at 140.  When the officer approached the defendant, he did not smell alcohol but noticed that her eyes were red.  Id.  When questioned, the defendant denied having been drinking and explained her eyes were red because "she was just tired."  Id.  Suspecting that the defendant was impaired because of his observations and the record of prior drug-related offenses, the officer asked "for [the defendant's] consent to search the vehicle and told her that she didn't have to consent to the search, that she had the right to refuse, and that she was free to go."  Id. at 373, 56 P.3d at 141.  The defendant consented to a search, which ultimately recovered "a glass pipe with residue resembling that of crystal methamphetamine."  Id.

The facts here are distinguishable from the facts of Kaleohano because there, at the time of the arresting officer's "brief questioning aimed at confirming or dispelling his remaining suspicion," probable cause had not yet developed.  See id. at 380, 56 P.3d at 148.  Here, on the other hand, Spies's prior statement "It[']s all in there" gave rise to probable

cause to arrest.  See State v. Phillips, 138 Hawai'i 321, 346, 382 P.3d 133, 158 (2016) (quoting Navas, 81 Hawai'i at 116, 913 P.2d 42) ("Probable cause exists when the facts and circumstances within one's knowledge and of which one has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed."); see also HRS § 803-5 (2014) (authorizing warrantless arrest by a police officer upon probable cause).  Thus, any question seeking to confirm or dispel that probable cause "is reasonably likely to elicit an incriminating response," and must be preceded by a Miranda warning if the suspect is in police custody.  Hoffman, 155 Hawai'i at 175, 557 P.3d at 904.  As we explained in Hewitt, "the Ketchum rule remains in effect: Miranda warnings are required by article I, section 10 of the Constitution of the State of Hawai'i when probable cause to arrest has developed."  153 Hawai'i at 44, 526 P.3d at 569.

Whether Officer Gaspar sought to have Spies reiterate or confirm his incriminating statement, or clarify or expand upon it, is immaterial.  See Innis, 446 U.S. at 301.  Questioning subsequent to an incriminating statement is interrogation within the meaning of Hoffman because it is highly likely to elicit an incriminating statement.  Hewitt, 153 Hawai'i

at 44, 526 P.3d at 569.  Questioning therefore should have

stopped as soon as Spies made his first incriminating statement.

After that point, because Spies was in custody, he was entitled

to an advisement of his rights under Miranda before being

subject to interrogation.  See id.  Because Spies's

incriminating statement was the product of custodial

interrogation in the absence of a Miranda warning, the statement

was subject to exclusion.  See Ah Loo, 94 Hawai'i at 210, 10 P.3d

at 731.  To the extent that the circuit court determined that

Spies's subsequent on-the-scene statements were not subject to

exclusion, the circuit court erred.  See id.

We next address whether the error was harmless beyond

a reasonable doubt.

> Once it has been determined that a confession was
> erroneously admitted into evidence, the appellate court
> must consider whether the erroneous admission was harmless
> beyond a reasonable doubt.  [State v. ]Matsumoto, 145
> Hawai'i [313,] 327, 452 P.3d [310,] 324 [(2019)].  The
> erroneous admission of evidence is not harmless when there
> is a reasonable possibility that the error might have
> contributed to the conviction.  State v. McCrory, 104
> Hawai'i 203, 210, 87 P.3d 275, 282 (2004).  If such a
> reasonable possibility exists, then the error is not
> harmless beyond a reasonable doubt and the judgment of
> conviction on which it may have been based must be set
> aside.  Id. (quoting State v. Gano, 92 Hawai'i 161, 176, 988
> P.2d 1153, 1168 (1999)).

State v. Baker, 147 Hawai'i 413, 435, 465 P.3d 860, 882 (2020).

> With respect to assessing whether the erroneous
> admission of evidence was harmless beyond a reasonable
> doubt, this court has stated that the "[m]ere sufficiency
> of the evidence to support the jury verdict, apart from
> that aspect of the case affected by the error, would not be
> enough."  State v. Pokini, 57 Haw. 26, 30, 548 P.2d 1402,

1405 (1976).  However, . . . "'[w]here there is a wealth of overwhelming and compelling evidence tending to show the defendant guilty beyond a reasonable doubt, errors in the admission or exclusion of evidence are deemed harmless.'" <u>State v. Toyomura</u>, 80 Hawai\`i 8, 27, 904 P.2d 893, 912 (1995) (quoting <u>State v. Nakamura</u>, 65 Haw. 74, 80, 648 P.2d 183, 187 (1982)); <u>accord</u> <u>State v. Rivera</u>, 62 Haw. 120, 128, 612 P.2d 526, 532 (1980).

<u>State v. Veikoso</u>, 126 Hawai\`i 267, 276, 270 P.3d 997, 1006 (2011).

Spies's statement "to the effect of 'It's in the black wallet' and referred to the center console" was used as one of several bases for the subsequent search warrant for the pickup truck and was introduced at trial as part of the police station interview.[20]  In each instance, we conclude that the error was harmless beyond a reasonable doubt.

Although the affidavit in support of the search warrant relied in part on a statement made in violation of

---

[20]     Spies's statement was introduced at trial only to the extent the transcript of Spies's police station interview was admitted into evidence and published to the jury:

> "[Officer Gaspar]:  (Indiscernible) <u>in our conversation you just said whatever we was looking for was in the black wallet.  Right?  That's what you told us there</u>.  We found the black wallet today.  Everything you said was in the center console of the truck, and we found another black wallet today was inside one black bag belonging to the girl.  Whose (Indiscernible) was that?  Yours or hers?
>
> "[Spies]: Me.
>
> "[Officer Gaspar]: That was yours?
>
> "[Spies]: Yeah.["]

(Emphasis added.)

63

Miranda, we conclude that the evidence was cumulative and there was "sufficient probable cause . . . to issue the warrant without relying on the suppressed evidence." State v. Brighter, 63 Haw. 95, 101, 621 P.2d 374, 379 (1980) (citing State v. Lane, 245 S.E.2d 114 (S.C. 1978)). The warrant application also relied on Spies's prior admissible statement, the drug detector dog's alert, and Officer Gaspar's knowledge, through his training and experience, that drug dealers keep their drugs close to them, including in their vehicles. Accordingly, we conclude that probable cause to search was supported by evidence that was known through an independent source and thus was not tainted as fruit of the poisonous tree. See Trinque, 140 Hawai‘i at 281, 400 P.3d at 482 ("[T]he ultimate question that the fruit of the poisonous tree doctrine poses is as follows: Disregarding the prior illegality, would the police nevertheless have discovered the evidence?"). Because the search warrant application could be sustained on other grounds, its reliance on Spies's statement in violation of Miranda was harmless beyond a reasonable doubt. See id.

Regarding the statement's admission at trial, we also conclude it was harmless beyond a reasonable doubt because it was cumulative and "overwhelming and compelling evidence tending to show [Spies] guilty beyond a reasonable doubt" was presented

64

to the jury at trial.  See Veikoso, 126 Hawaiʻi at 276, 270 P.3d at 1006.  In addition to the physical evidence recovered from Spies's pickup truck, which included 10 clear packets of substances confirmed to contain methamphetamine, the jury was presented with Spies's incriminating statement in response to the request for consent to search the pickup truck, as well as Spies's police station confession that the recovered narcotics belonged to him, a confession that, as discussed below, was not subject to exclusion.

Based on the foregoing, we conclude that to the extent the circuit court erred in determining that Spies's subsequent on-the-scene statements were not subject to exclusion, that error was harmless beyond a reasonable doubt.

3.  **Police Station Interview**

Following the execution of the search warrant on Spies's pickup truck and the recovery of 10 clear packets of substances later confirmed to contain methamphetamine, Spies participated in a police station interview.  Prior to being questioned, Spies was informed of his rights under Miranda as well as his right to have counsel present.  Spies waived his right to have an attorney present and consented to answer Officer Gaspar's questions.  A recording of the interview was admitted into evidence and published to the jury.  During the

interview, Spies made several incriminating statements, including that the "eight or nine [balls]" of "crystal," "[o]r ice, whatever you guys call it," that the police recovered from the black wallet in the pickup truck belonged him.

Spies does not appear to separately challenge the ICA's affirmance of the circuit court's determination that the police station interview was voluntary and thus admissible at trial.  Nevertheless, because these statements were voluntarily made following a Miranda advisement, and because the statements are not subject to exclusion as fruit of the poisonous tree, we conclude that the ICA properly affirmed the circuit court's determination that Spies's incriminating statements during the police station interview following his arrest were therefore not subject to exclusion.

//

//

//

//

//

//

//

//

## V.    CONCLUSION

For the foregoing reasons, we reverse the ICA's November 14, 2024 Judgment on Appeal.  The circuit court's June 9, 2023 Judgment of Conviction and Sentence is hereby affirmed.

Andrew M. Kennedy
for Jonathan P. Spies

Charles E. Murray III
for State of Hawai‘i

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Lisa M. Ginoza

/s/ Dyan M. Medeiros